CLIENTS' COUNCIL, Debra Wyatt and Merlene McGloughlin, Appellants,

v.

Samuel R. PIERCE, Jr., Secretary of the Department of Housing and Urban Development; Thomas Armstrong, Regional Administrator, Region Six Department of Housing and Urban Development; and Andrew Watts, Area Manager, Department of Housing and Urban Development, Appellees.

No. 82–1383.

United States Court of Appeals, Eighth Circuit.

Submitted Dec. 9, 1982.

Decided June 28, 1983.

Rehearing and Rehearing En Banc Denied Sept. 15, 1983.

J. Paul McGrath, Asst. Atty. Gen., Washington, D.C., Larry R. McCord, U.S. Atty., Fort Smith, Ark., Anthony J. Steinmeyer, Michael Jay Singer, Attys.' Civ. Div., Dept. of Justice, Washington, D.C., for appellees; Gershon M. Ratner, Associate Gen. Counsel for Litigation, John W. Herold, Atty., Dept. of Housing and Urban Development, Washington, D.C., of counsel.

Michael M. Daniel, Elizabeth K. Julian, Julian & Daniel, Dallas, Tex., Gary R. Thomas, East Texas Legal Services, Nacogdoches, Tex., for appellants.

Before HEANEY and BRIGHT, Circuit Judges, and HENLEY, Senior Circuit Judge.

HEANEY, Circuit Judge.

Debra Wyatt and Merlene McGloughlin, black women who are eligible for admission to the Texarkana public housing program, ask this Court to reverse the district court [1] and to find that the Secretary of the Department of Housing and Urban Development (HUD) and various other HUD officials have discriminated against black persons who reside in or are eligible for public

---

1. The district court's decision is reported at 532 F.Supp. 563 (W.D.Ark.1982).

housing in Texarkana, Arkansas.[2] After a careful review of the record and the briefs, we do so.

Public housing in Texarkana was totally segregated from the occupancy of the first project in 1952 until 1971, and remained virtually one hundred percent segregated until after the initiation of this lawsuit in 1979. The units that housed black persons were less well constructed and less well maintained than the units occupied by whites. Black employees were also subject to discriminatory working conditions. HUD officials abdicated their affirmative duty to eliminate the racially discriminatory practices of the Texarkana Housing Authority, and in fact participated in that discrimination in violation of the federal constitution and federal housing laws. Accordingly, we reverse the district court's dismissal of the action and remand the case to it with directions to fashion an appropriate, effective remedy to eradicate the effects of past discrimination in the Texarkana public housing program.

## I. PROCEDURAL HISTORY

Wyatt and McGloughlin filed this action against officials of the Texarkana Housing Authority (THA) and HUD on November 15, 1979. Their complaint alleged that HUD and the THA were liable for racial discrimination in the operation of federally funded housing projects in Texarkana. The suit against the THA was settled by a court-approved "Agreed Judgment" prior to trial.[3] The Civil Rights Division of the Department of Justice commenced a separate action against the Housing Authority after the appellants initiated their suit, which was also settled by a consent order.[4]

The district court considered the case against HUD officials on the basis of the pleadings, the interrogatories and answers thereto, and the agency's files. The appellants moved for partial summary judgment on the issue of liability under Title VI of the Civil Rights Act of 1964,[5] Title VIII of the Civil Rights Act of 1968,[6] and the fifth amendment.[7] HUD filed a cross-motion for dismissal of the complaint or, in the alternative, for summary judgment on the merits. The district court ruled that the appellants could not recover under the fifth amendment because they failed to prove intentional racial discrimination on the part of HUD officials. The court also dismissed their Title VI claim on the ground that Title VI did not create a private cause of action against a federal funding agency, and that even if it did, the appellants had failed to exhaust their administrative remedies and had failed to prove that HUD's actions had a discriminatory impact or purpose. Finally, the district court held that HUD officials

2. Plaintiff Clients' Council, an unincorporated association of citizens who reside in and/or are eligible for admission to the Texarkana housing program, has not joined in this appeal.

3. This settlement provided that the THA would apply for 150 additional family and/or elderly units of low income housing. In the event that such assistance was received, the THA agreed to allow transfers to the new units and to select tenants from the public housing waiting list in such a manner as to result in an occupancy pattern of forty percent black, sixty percent white in the new units. The settlement also provided that the THA would use good faith efforts to fill vacancies opened in the existing units in a manner calculated to achieve the forty percent black, sixty percent white occupancy pattern. Finally, the settlement provided that the THA Board members would continue to appoint members to the Board of Commissioners in such a manner that at least one of the members would be black.

4. This consent order enjoined the THA from engaging in racial discrimination in tenant assignments and employment, ordered the THA to continue to adhere to a 1978 compliance agreement with HUD, and required the THA to submit various reports and to advise the Justice Department of any complaints against it concerning equal housing opportunity.

5. 42 U.S.C. § 2000d et seq. (1976 & Supp. IV 1980).

6. 42 U.S.C. § 3608(e)(5) (1976 & Supp. IV 1980).

7. The appellants' complaint also included allegations under 42 U.S.C. §§ 1981, 1982 and 1983 and the fourteenth amendment, but they sought leave to amend their complaint to add their fifth amendment claim and to delete their section 1981, 1982 and 1983 allegations. The district court apparently granted this request sub silentio. See 532 F.Supp. at 566.

had met their duty under section 808(e)(5) of Title VIII to promote fair housing in Texarkana.

## II. FIFTH AMENDMENT

■ The district court correctly stated that in order to establish a constitutional violation, the appellants must prove that HUD officials acted with a discriminatory purpose. *See Personnel Administrator v. Feeney*, 442 U.S. 256, 272–281, 99 S.Ct. 2282, 2292–2297, 60 L.Ed.2d 870 (1979); *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 264–265, 97 S.Ct. 555, 562–563, 50 L.Ed.2d 450 (1977); *Washington v. Davis*, 426 U.S. 229, 239–241, 96 S.Ct. 2040, 2047–2048, 48 L.Ed.2d 597 (1976). Although there is ample evidence that the Texarkana Housing Authority intentionally discriminated on the basis of race, HUD cannot be held liable unless its own conduct was tainted with a discriminatory purpose. *See Pullman-Standard v. Swint*, 456 U.S. 273, 280, 102 S.Ct. 1781, 1786, 72 L.Ed.2d 66, 75 (1982).

■ The Supreme Court has stated that "determining the existence of a discriminatory purpose 'demands a sensitive inquiry into such circumstantial and direct evidence as may be available.'" *Rogers v. Lodge*, —— U.S. ——, ——, 102 S.Ct. 3272, 3276, 73 L.Ed.2d 1012, 1018 (1982) (citing *Village of Arlington Heights v. Metropolitan Housing Development Corp., supra*, 429 U.S. at 266, 97 S.Ct. at 564). The "totality of the relevant facts" must be examined in order to ascertain whether a discriminatory purpose may legitimately be inferred. *See Rogers v. Lodge, supra*, —— U.S. at ——, 102 S.Ct. at 3276, 73 L.Ed.2d at 1018 (citations omitted); *Personnel Administrator v. Feeney, supra*, 442 U.S. at 279 n. 24, 99 S.Ct. at 2296 n. 24; *Village of Arlington Heights v. Metropolitan Housing Development Corp., supra*, 429 U.S. at 266–268, 97 S.Ct. at 564–565; *Washington v. Davis, supra*, 426 U.S. at 242, 96 S.Ct. at 2049.

■ When a court is faced with an aggregation of many decisions made by different administrators as is the case here, the impact or effect of the choices made is "an important starting point" in determining purposeful discrimination. *Crawford v. Board of Education*, —— U.S. ——, ——, 102 S.Ct. 3211, 3221, 73 L.Ed.2d 948, 960 (1982) (citing *Personnel Administrator v. Feeney, supra*, 442 U.S. at 274, 99 S.Ct. at 2293; *Village of Arlington Heights v. Metropolitan Housing Development Corp., supra*, 429 U.S. at 266, 97 S.Ct. at 564).

> Adherence to a particular policy or practice, "with full knowledge of the predictable effects of such adherence upon racial imbalance * * * is one factor among many others which may be considered by a court in determining whether an inference of segregative intent should be drawn."

*Columbus Board of Education v. Penick*, 443 U.S. 449, 465, 99 S.Ct. 2941, 2950, 61 L.Ed.2d 666 (1979) (citations omitted).

Other factors which may be relevant include the historical background, the sequence of events leading up to the challenged decisions, the departures from the normal procedural sequence, the substantive departures from the norm, and the alternatives that were available. *See Columbus Board of Education v. Penick, supra*, 443 U.S. at 461, 99 S.Ct. at 2948; *Village of Arlington Heights v. Metropolitan Housing Development Corp., supra*, 429 U.S. at 266–268, 97 S.Ct. at 564–565; Note, *Discriminatory Purpose and Disproportionate Impact: An Assessment After Feeney*, 79 Colum.L.Rev. 1376, 1395–1396, 1407–1413 (1979). The inquiry is a practical one which is designed to determine whether the decisionmaker's actions—in this case, HUD's actions from 1969 through 1979—could not "reasonably be explained without reference to racial concerns." *Columbus Board of Education v. Penick, supra*, 443 U.S. at 461, 99 S.Ct. at 2948. HUD has intentionally discriminated if its officials "selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,'" the racially segregative effect of its actions in Texarkana. *Personnel Administrator v. Feeney, supra*, 442 U.S. at 279, 99 S.Ct. at 2296.

The district court held that "the federal defendants have taken no action with a discriminatory intent." 532 F.Supp. at 575. We are convinced that this finding is clearly erroneous. *See Pullman-Standard v. Swint,* *supra,* 456 U.S. at 287, 102 S.Ct. at 1789, 72 L.Ed.2d at 79. In our view, the evidence compels a finding that HUD officials acted with a discriminatory purpose. A detailed chronology of the facts reveals the basis for this conclusion.

The THA was established in 1948 pursuant to the Arkansas Housing Authorities Act, Ark.Stat.Ann. §§ 19–3001 *et seq.* (1980 & Supp.1981). A five-member Board of Commissioners serves as the governing body of the Housing Authority.[8] In 1950, the City of Texarkana and the THA Board entered into an agreement to develop low income housing. From 1950 to 1969, seven housing projects were built. These projects contained a total of 310 housing units, which were segregated by race from the date of their initial occupancy as follows:

| Project Number | Name | Number of Units | Initial Date of Occupancy | Racial Composition Through 1969 |
|---|---|---|---|---|
| 15–1 | Ozan Courts | 80 | 1952 | 100% black |
| 15–2 | Bramble Courts | 80 | 1953 | 100% white |
| 15–3 | Carver Courts | 40 | 1958 | 100% black |
| 15–4 | Highpoint Courts | 40 | 1961 | 100% white |
| 15–5 | George Johnson Homes | 20 | 1964 | 100% black |
| 15–6 | Hacota Homes | 20 | 1965 | 100% white |
| 15–7 | Inghram Homes | 30 | 1966 | 100% black |

HUD Representative John M. Nelson conducted the agency's first compliance review[9] in May, 1969. Nelson found sixteen Title VI violations and indicated in his report to the Director of Program Service and Review Division, Harold A. Odom, that:

> The Executive Director [B.R. McCarley] admitted that project courts were segregated and that no effort was being made to integrate. A list furnished by the local Housing Authority (see Exhibit I) clearly reflects occupancy as white and non-white. [McCarley] stated that applicants, when filing, would indicate acceptance of occupancy in all-white occupied projects if they were white, and likewise Negroes preferred only all-Negro occupied projects. No objection was offered to trying to integrate which [McCarley] felt due to past and present community attitudes that such could not be accomplished.

Nelson's report further noted that the THA maintained a dual system of processing and assigning applicants. Although the THA had adopted a formal Methods of Administration (MOA) process for assigning tenants in January, 1969,[10] it was not being followed. Rather, applications for the all-white projects—Bramble Courts, Highpoint, and Hacota—were received and processed at Bramble Courts, while applications for the all-black projects—Carver, George Johnson, Inghram, and Ozan Courts—were received and processed at Ozan Courts.

---

**8.** The five Commissioners were initially appointed by the Mayor of Texarkana. Subsequent vacancies are filled by the Commissioners themselves, subject to approval by the municipal council or municipal governing body. *See* Ark.Stat.Ann. §§ 19–3005, 19–3006 (1980 & Supp.1981).

**9.** *See* 24 C.F.R. § 1.7(a) (1982), which provides:

> § 1.7 *Conduct of investigations.*

> (a) *Periodic compliance reviews.* The responsible Department official or his designee shall from time to time review the practices of recipients to determine whether they are complying with [Title VI].

**10.** A Methods of Administration had been required since 1967, but the THA did not submit an acceptable plan until January, 1969, after the approval of Resolution Number 166.

Black applicants were never considered when vacancies in white units occurred, and no community-wide list of applications or centralized tenant assignment office existed.[11]

After the May, 1969, compliance review, HUD Representative Nelson told the THA of the actions that had to be taken in order to achieve compliance with Title VI, and a follow-up letter was written to Executive Director McCarley by T.H. Callahan, Assistant Regional Administrator. Callahan's letter required the THA to:

1. Establish one office as a central tenant selection and assignment office.

2. Execute applications in original only, forward daily to designated assignment office, and enter on Record of Application form in date sequence order.

3. Code all tenant applications as to race and sequence number.

4. Assign all units from designated assignment office in order of sequence shown on Record of Application.

5. Post notice in application-taking project offices that standing on Record of Application is available during office hours and where located.

6. Record of Application show all offers, refusals, efforts to locate, assignments, and basis if a hardship case determination.

7. Establish policy of determining hardship cases other than those specified in MOA Tenant Assignment Plan.

8. Establish continuing tenant occupancy list in sequence order of assignment, from earliest tenant to present date, showing application number, name, application date and unit assigned, and date.

9. Remove or line out all unlocated applicants from Record of Application.

10. Require new applications from re-applying applicants that once filed and could not be located at the time they reached sequence eligibility. This will permit old applications to be destroyed which will provide more filing space and the purification of applications. Use of the Record of Application to reflect reasons for nonassignment will serve as adequate record.

11. Establish vacancy report showing unit number, name of last tenant, date vacated, status (painting, renovating), and date ready for occupancy.

12. Follow Tenant Assignment Plan in approved Methods of Administration, making every effort to integrate all project units in accordance with application sequence standing on Record of Application.

13. Post separate LHA [Local Housing Authority] Equal Opportunity policy statement on the bulletin board of each application-taking project office.

14. Remove all superseded notices covering tenant priority selection from project offices taking applications.

15. Post approved Methods of Administration on all bulletin boards of application-taking projects.

16. Eliminate any suggestion of Freedom of Choice by applicant on application.

The letter requested the THA respond to these recommendations by August 1, 1969. The administrative record later reveals that Executive Director McCarley apparently wrote a letter dated July 23, 1969, indicat-

---

11. Nelson's report made the following observations concerning the use of hardship determinations by the THA:

Hardship case determinations are made by either the Project Manager, Mrs. Manly, or her assistant, Mrs. Willie Stephens. In this respect, Apartment 508 was vacated on May 1, 1969. It was rented on May 21, 1969, to Mattie McArthur (white) who filed on May 19, 1969. There was no record of a previous application. She was assigned on the basis of hardship which was determined by the fact that she was moving back to Texarkana as an elderly person having no place to live. * * * This apartment had several offers and refusals mainly on the basis that it was an inside apartment at Bramble Courts [an all-white project]. It was determined as a hardship by Mrs. Stephens, who assigned Mrs. McArthur a two-bedroom apartment when she needed only one bedroom. No consideration was given to previous filing applicants of which many were Negroes.

ing that the THA was complying with all of the recommendations. HUD conducted no investigation on its own in either 1969 or 1970, and other than the passage of a resolution by the THA, actual practices and conditions remained unchanged.

Nevertheless, HUD approved the THA's request for additional federal funds to build two more housing projects on December 21, 1970: HUD authorized Annual Contributions Contracts for thirty elderly units (Hacota II) and sixty-two family units (Union Village) at a Total Development Cost of $1,729,313. After this grant was reported in the local paper, N.H. Hilliard, a resident of Texarkana, wrote to Senator J.W. Fulbright and Congressman David Pryor questioning HUD's action. Hilliard's letter stated that the THA assigned units by race and maintained completely segregated housing. Moreover, Hilliard noted that there had never been a black member on the THA Board of Commissioners, although over half of the units were occupied by blacks. Senator Fulbright forwarded the letter to

12. Congressman Pryor apparently forwarded his letter to HUD as well. Hilliard also filed a complaint with the agency.

13. Stewart's report stated:
    The Record of Applications indicated that there was no clear understanding as to what constituted a "hardship" case. Also, during the interviews with the two project managers, there seemed to be confusion over the difference between "hardship" and "preference" ratings. In most instances, this confusion seemed to result in manipulation of the order in which offers were made.
    However, there was no explanation for not making the following offers according to time and date of application. Leona Trollman (White) filed an application on December 17, 1969, and was assigned a one-bedroom unit in a White occupied location on April 22, 1970. Lovelle Sherman (Negro) filed an application on November 20, 1969, and was determined to need a one-bedroom unit, but was not assigned as of February 4, 1971. Joe Cornelison (White) filed on December 31, 1969, and was assigned a one-bedroom unit on July 17, 1970. Another unexplained example of an applicant being made an offer ahead of others needing a similar unit was the assignment of Carol Rose (Negro) to a two-bedroom unit on May 8, 1970, after filing an application on April 29, 1970.

HUD [12]. The agency subsequently investigated the matter.

On February 4, 1971, Darwin Stewart of HUD's Equal Opportunity staff visited the THA. Stewart found that nothing had changed since the initial finding of noncompliance in 1969: the THA continued to ignore its adopted Methods of Administration and plainly and intentionally continued to discriminate on the basis of race. Although tenant assignments were now made from the central office at Bramble Courts, applications were still being taken at two locations—Bramble Courts for white applicants and Ozan Courts for black applicants. The seventy-eight new assignments that had been made since June, 1969, followed the same well-established pattern, and THA Executive Director McCarley "readily admitted that Negroes were offered and assigned to specified Negro locations; Whites were only offered and assigned to specified White-occupied locations." The THA also continued to use "hardship and preference ratings extensively to juggle the assignment of tenants according to race." [13]

    All offers to Negroes were to Negro-occupied locations. All offers to Whites were to White-occupied locations. In no case was more than one offer made to an applicant. Whites were more often given "hardship" preference. Negroes were more often given preference because of being displaced by government action.
Stewart's report contained the following five conclusions:
    A. The Authority is clearly in violation of the adopted Methods of Administration (Plan B), Title VI of the Civil Rights Act of 1964, and Departmental regulations pursuant thereto.
    B. All White-occupied locations are in areas where desegregation should present no problem. However, this is not true with Negro-occupied locations.
    C. It is questionable as to whether relocation of low-income displacees in the Neighborhood Development Program area is feasible with segregated low-rent housing. Also, regulations prohibit the use of relocation resources not available on a nondiscriminatory basis.
    D. Equal Opportunity must exercise control over definitions of hardship, preference ratings, and good cause for rejecting offers. It was apparent that this Authority used hardship and preference ratings extensively to juggle the assignment of tenants according to race.

During his investigation, Stewart was told that the THA was "known to be opposed to low-rent housing," apparently because the Chairman of the Board of Commissioners, Tillman Johnson, "own[ed] considerable rentals occupied by low-income Negroes." Stewart's report also indicated that Johnson was "known in the community as a strong opponent of open occupancy."

Stewart made four recommendations to his supervisor at HUD, Harold Odom. One of Stewart's recommendations was to "[t]ake the necessary action to suspend funding of additional low-rent housing units, Modernization Program, and Neighborhood Development Program;" another was to "[n]egotiate a new tenant assignment plan, making a realistic approach toward progressive desegregation." HUD Assistant Regional Administrator for Equal Opportunity, A. Maceo Smith, had already written to the THA Board to inform the Commissioners that the THA was still in noncompliance with Title VI. Smith's letter indicated "some reluctance" to supply funds either for the two new projects or for the modernization of Ozan Courts, which the THA had requested. On February 12, HUD Area Director Wayne H. Babbitt wrote the following letter to the THA Board:

> The Housing Authority of the City of Texarkana, Arkansas has been found in violation of Title VI of the Civil Rights Act of 1964 with regard to the Methods of Administration adopted by Resolution No. 166 of your Board of Commissioners on January 4, 1969.
>
> Specifically, investigation by both Regional and Area Office personnel disclosed that Resolution No. 166, paragraph 5 "Plan B" is not being followed in the assignment of applicants to projects.
>
> We must at this time insist on immediate compliance in all future tenant assignments with the adopted Tenant Assignment "Plan B." Administratively, we recommend the adoption of the following procedures:
>
> (1) Application for Admission:

(a) Indicate both the date and time that applications are received on the line "Date of Application."

(b) Record all entries in ink.

(2) Eligible list—consider breaking down the list into several lists by unit size. All lists of eligible applicants should be in ink.

(3) Obtain a signed form from applicants indicating their rejection of offers. Document efforts to contact applicants whom you are unable to locate.

> The Board of Commissioners should in writing direct the Executive Director to adhere to the Tenant Assignment Plan as adopted by the Board. Please send us a copy of your directions to the Executive Director along with a position statement by the Board reaffirming your support of Resolution 166 "Establishing Methods of Administration of Low-Rent Housing Under Title VI of the Civil Rights Act of 1964."
>
> The Little Rock Area Office will conduct periodic inspections of your records until such time as we can determine that your Housing Authority is in compliance with the intent of the Law. Pending that determination, I have directed that actions be deferred on all Low-Rent Public Housing development commitments in Texarkana, Arkansas.
>
> Please notify this office within ten (10) days as to what actions your Authority will take.

On February 19, 1971, the THA Board passed Resolution 184, which adopted the recommendations made by Babbitt. After two HUD staff members visited with THA Executive Director McCarley on March 23, HUD Area Director Babbitt sent another letter to THA Board Chairman Johnson which stated that visits by HUD staff "have revealed that the Texarkana Authority is beginning to implement some of the procedures necessary for compliance with Title VI * * *."

On April 2, Regional official Stewart conducted an on-site review of the THA's oper-

E. We are not in a position to comment on the racial makeup of the Board.

ations, which revealed continued noncompliance. Stewart's report concerning his April 2 visit stated:

The subject review revealed that since February 4, 1971, the Authority has offered five different applicants (both White and Negro) vacancies in locations occupied by a race different from that of the applicant's. One Negro applicant has accepted a unit in the Bramble location, previously occupied by only Whites. The other four refused the offers and had not been made a second offer. Authority personnel had misunderstood their tenant assignment plan and did not believe a second offer was in order. Preference ratings were not shown on the Record of Applications.

Only six weeks have elapsed since the Authority was put on Notice. It is the reviewer's opinion that the Authority has had insufficient time to demonstrate good faith. Certainly, one Negro in an 80-unit location would not be conclusive.

In a meeting with Doyle Davis, Area Office Model Cities Representative, it was pointed out that a half-million dollar drainage project involving the displacement of about 36 families was in jeopardy if the Local Housing Authority was not immediately found to be in compliance. In order to familiarize the City officials with the problems at hand, Mr. Davis proposed and arranged an informal meeting with various City officials for a forthright discussion. The following were present:

Jack E. Trigg, Mayor
Paul Schriever, City Manager
Thomas McRae, Model Cities Director
Doyle Davis, Area Office
William "Sonny" Walker, Area Office
Darwin Stewart, Regional Office

It was explained that a credibility gap exists in our relations with the Local Housing Authority, and in order to secure a favorable recommendation immediately, the Local Authority must make an overt gesture of good faith. The immediate appointment of a Negro to the Local Housing Authority Board was proposed as an appropriate gesture. Naturally, and as expected, the State Law was reported to preclude such an act in the near future. At this point, it was necessary to remind the City officials that Federal Law has been flaunted for years. Also, the Mayor's recent affirmation of Tillman Johnson as Chairman of the LHA Board was questioned in view of his admitted concern about a conflict of interest. Mr. Johnson is also known in the community as a strong opponent of open occupancy. It also seemed appropriate to call attention to the report that local State representation recently supported and won exemption for the LHA in a State law discontinuing the self-perpetuating Boards in cities the size of Texarkana, Arkansas.

Other proposals made to the City body involved reports on integration in low-rent housing and our monitoring of initial assignments in ARK 15–8 and 15–9.

It is recommended that the LHA be considered in noncompliance until the above proposals are met or until the LHA can be found in compliance after operating under their present procedures for 90 days.

Although no positive response by the THA was forthcoming, HUD released $525,690 in modernization funds in May.

HUD Regional Office staff member Stewart visited the THA again in June, 1971. Two more black applicants had been offered and accepted units in Bramble Courts, but Stewart concluded that "[t]he Local Housing Authority has not achieved open occupancy. The three Negro families in a previously all-White location (80 units) is tokenism." Stewart recommended freezing all vacancies until the black tenants displaced by the modernization of units at Ozan Courts could be adequately accommodated. No attempts to implement the recommendation or to otherwise act to affect

the THA's policies toward integration were taken in 1971 or 1972.[14]

Stewart conducted another compliance review in early 1973, after which he concluded "that the Local Housing Authority is intending to make the two new projects, 62 family units in a traditionally White neighborhood and 30 elderly units in a mixed neighborhood, overwhelmingly White-occupied." Stewart also noted that the THA Board was composed of "five White males in spite of a resignation in March 1972," and found that tenant assignment practices remained discriminatory: offers for one-bedroom units "were consistently White to White locations; Negroes to Negro locations." "Numerous White applicants were listed as hardships" for the two-, three- and four-bedroom units and "White applicants were being given preference by making wide use of the hardship provision among White applicants." The THA Executive Director still was not following the tenant assignment plan, and "much inaccurate documentation was prevalent on the Record of Applications." [15]

On March 2, 1973, HUD Area Director Thomas E. Barber nevertheless approved an additional $205,000 in modernization funds for Ozan Courts. No strings were attached. One month later, the HUD Regional Office recommended that "any nonmandatory financial assistance requested by this Authority should be deferred" pending a conciliation or settlement agreement, because the THA was not only in continued noncompliance with Title VI, but also had violated Section 804(a) of Title VIII by "steering" applicants on the basis of race. In a memo dated April 6, 1973, Barber concurred, stating, "I am confident your investigations will accurately disclose any noncompliance activities, including anything that might extend to my staff."

Shortly thereafter, the THA applied for an additional $21,053 in modernization funds for the Ozan Courts project. Attempts were made by the HUD Regional Office to negotiate a conciliation agreement prior to the approval of the $21,053 in additional funds, but the THA Board was unwilling to sign any form of agreement. THA members who attended the conciliation conference held in August, 1973, contended that they were in compliance with HUD regulations and claimed that two projects, Bramble Courts and Highpoint, were already integrated. They also indicated that they were opposed to placing a minority on the Board and refused to accept the premise that federal law applied to the THA. The items of significance which the Regional Office sought to obtain agreement on were:

1. Cease and desist "Steering" applicants to projects or units of their own ethnic origin.

2. Establish community wide application register. Date and time stamp all applications.

3. Make assignment of tenants in strict accordance with adopted MOA

4. Grievance Procedures.
5. Citizens' Participation.

The THA made no direct response to this letter, although in January, 1972, McCarley forwarded a copy of a letter and a resolution enacted by the Board, neither of which were contained in the administrative record.

---

14. In November, 1971, THA Executive Director McCarley wrote HUD, apparently "citing the progress that has been made by the Texarkana Arkansas Housing Authority in terms of making available public housing on a nondiscriminatory basis." HUD responded, assuming that the letter was the first, albeit overdue, of the monthly progress reports requested in March, 1971. Unfortunately, the report was far from complete, as HUD's reply demonstrates:

We commend your efforts as cited in your letter; however, we would appreciate knowing what progress has been made or is planned in the following areas:
1. Minority representation on the Board of Commissioners.
2. Minority Employment Opportunities.
3. Contracts with Minority Businesses.

15. By this time, forty units at Ozan Courts were removed for the Modernization Program, but there was no indication that those displaced were offered vacancies in an all-white project.

The employment situation at the THA reflected intentional discrimination as well: all employees at the central office in Bramble Courts were white and a black woman managed the Ozan-Carver (all black) projects.

(Board Resolution No. 184).[16] Document all actions in this regard.

4. Develop goals, timetables and targets for integration of existing projects.

5. Develop plan to integrate professional and clerical staff including the Central Office.

6. Develop and submit plan for notification to the community that the Local Housing Authority does practice open occupancy in all its projects.

7. Reoccupy all modernized units on an open occupancy basis.

8. Cease honoring preferences of White applicants.

9. Place a Negro on the Board of Commissioners.

No agreement was reached, and no modernization funds were released at that time.

Several months later, on November 30, 1973, Area Director Barber sent a memorandum to Regional official Victor Hancock entitled "Release of Additional Modernization Funds for Project ARK–15–1, Texarkana, Arkansas." Barber provided certain documents requested by Hancock concerning the modernization funds, and offered certain comments on the proposed conciliation agreement rejected by the THA. Barber stated that the THA had adopted the model lease and grievance procedure requested by HUD on June 11, 1973. He further indicated that the THA had previously reaffirmed its support of the MOA and was complying with it, including the maintenance of a community-wide register of applicants. Barber offered his view that "[t]he Authority seems willing to comply with Federal and State laws but reserves the right to request clarification of applicability where they believe there is some question," and expressed uncertainty as to how written hardship procedures could be developed.

Barber gave support to the encouragement of citizen participation and the inclusion of minority representation on the THA Board, but questioned how THA could develop goals and timetables for the integra-

tion of all projects and could reoccupy modernized units on an integrated basis while following the adopted MOA.

Finally, Barber offered his view that "four of the nine projects were integrated" based on report forms for periods ending June 30 and September 30, 1973, and stated that "[a]s of September 24, 1973, the Authority had ten regular employees, five administrative (one minority) and five maintenance (three minority) with one maintenance position vacant. In August 1973, Mr. Charles Mosley (minority) was promoted from Maintenance Mechanic 'A' to Working Foreman." He closed with the hope that this information would "be of assistance in the expeditious resolution of the noncompliance matter and release of the $21,053 additional modernization funds in question."

In December, the HUD Regional Office met with THA officials again and a "tentative agreement" was reached, the outlines of which Victor Hancock detailed in a letter to the THA on December 5, 1973:

1. The Board will prepare a negotiations agreement which substantially addresses itself to the problems set forth in the previous HUD conciliation agreement * * * and the Board will submit evidence of compliance and progress being made toward compliance therewith * * *.

2. The Board will agree that the next vacancy on the [THA] Board that occurs, as vacancy is defined by the Board, will be filled by a minority.

3. The Board will request that the State Association of Housing Authorities and/or the state Legislature take action as necessary to increase the size of Board membership throughout the state of Arkansas from five to seven members for the purpose of admitting minorities to membership.

4. That your Board will meet on Tuesday, December 11th, to approve or disapprove these actions * * * and if approved will submit the same for our review and concurrence.

---

16. This resolution was adopted in 1971.

The THA Board merely passed the following resolution:

The Housing Authority agrees that upon the occurrence of a vacancy in the local five-man board that a replacement will be selected by the remaining members of the Board as provided by law and in selecting said replacement members of minority races will be given every consideration and no individual will be excluded from becoming a member of the local Authority on the grounds of his-her race, color, or national origin. A seat on the local Housing Authority is to be considered vacant following the death or the voluntary and willing resignation of one of the local members and in no other instance.

HUD Regional officials concluded that not only was this resolution insufficient, but that the THA Board had not negotiated with them in good faith. Victor Hancock's memorandum to Area Director Barber explained this position; Hancock stated that the resolution

does not respond to the four issues set forth in my December 5 letter and * * * does not deal with items 1, 3, and 4 of my letter in any content. The Board was nonresponsive to the phrase that the [next Board vacancy] "will be filled by a minority." In lieu of that commitment, they state that "minority races will be given every consideration." Title VI of the Fair Housing Act of 1964 makes it mandatory that every consideration be given to minorities. The allegation in this instance is that the Authority has not given every consideration to minorities in the past nor do they commit themselves to filling a vacancy with a minority.

Unfortunately I can only reach the conclusion based on the evidence at hand and as a result of many meetings with the Board that they have not negotiated, in this instance in particular, in good faith. Accordingly, the request for release of $21,053 to the modernization contract cannot be done with Equal Opportunity concurrence.

Four months later, on April 22, 1974, THA Executive Director McCarley wrote to J.B. Green, Chief of the Housing Programs Management Branch at HUD. McCarley informed Green that after receiving three inches of rain in a twenty-four hour period, the THA discovered that ten units in the Ozan Courts project leaked and unless the modernization funds were released for additional roof work, considerable damage would occur. On May 23, 1974, Area Director Barber wrote Regional Administrator Richard Morgan requesting that he personally review the Title VI situation at the THA and "if at all possible permit our releasing of the funds." Barber pointed out the need for the funds to repair the roofs and stated that reroofing was essential if the $731,820 spent in modernizing the units was to be protected. Enclosing a copy of his November 30 memorandum "to fully apprise [Morgan] of the Title VI problem," Barber continued:

As indicated in our memo of November 30, [1973], the LHA is following its MOA, and attached is a letter from the Authority dated April 18, 1974, pointing out the percentage of non-white to white tenants which indicates a good degree of integration, proper handling of applications, housing assignments and offers.

The real problem, as we view it, is the fact that the Authority Board did not agree to specifically place a minority on the Board when the next vacancy might occur.

The Board which has an Attorney on it states it will give every consideration to a minority, and in their opinion this complies with the law as it does not specifically require membership of a minority to the exclusion of all other considerations.

Normally, we would not press an issue of this nature, but there is a $700,000 investment that will deteriorate rapidly if some action is not taken soon. Further, this office feels that with integrated projects, city wide application registers, a policy of following its MOA, and a willingness of the Authority Board to give every consideration to a minority member

that EO should lift its objection to release of the funds in question.

Barber's request for the release of the funds resulted in another compliance review in June, 1974, by HUD official Thomas Broadwell of the Field Support Staff. Broadwell had not been previously involved in the THA case; but after a brief "[v]isual observation of the Agency's operation and actions taken," Broadwell concluded that the THA had "progressively improved their posture * * * since the initial compliance review was conducted in May 1969."

Broadwell supported his conclusion by reference to Area Director Barber's memorandum which Broadwell said "reflects that four of the projects were integrated," and by noting the past resolutions that had been adopted by the THA Board. The only *objective* evidence of improvement, however, was the promotion of one black maintenance person and the assignment of some black tenants to three white projects, although blacks were segregated within these projects by groups of units. The occupancy patterns at this time were as follows:

| Project Number | Name | Number of Units | Racial Composition 1974 |
|---|---|---|---|
| 15–1 | Ozan Courts | 80 | 100% black |
| 15–2 | Bramble Courts | 80 | 58 white/ 6 black* |
| 15–3 | Carver Courts | 40 | 100% black |
| 15–4 | Highpoint Courts | 40 | 37 white/ 2 black |
| 15–5 | George Johnson Homes | 20 | 100% black |
| 15–6 | Hacota Homes | 20 | 100% white |
| 15–7 | Inghram Homes | 30 | 100% black |
| 15–8 | Hacota II + | 10 | 100% black |
|  |  | 20 | 100% white |
| 15–9 | Union Village | 62 | 37 white/19 black* |

*Project substantially segregated by race among buildings.
+ This project includes two locations separated by a road and a row of private homes.

HUD officials made no investigation to determine if the resolutions cited by Broadwell in his November, 1973, memorandum had been implemented, even though they were aware that the THA had adequate paperwork on file, and the real issue was *implementation*. As some HUD officials recognized, the resolutions had consistently been ignored and all efforts to achieve compliance had failed because the THA simply would not cooperate.

Over the protests of these officials, particularly those of Harold Odom, who had been involved with the Texarkana case since 1969, HUD released the modernization funds and wrote a letter to the THA which stated that the Authority was in substantial compliance with the law. As a result of this finding, the Texarkana case was officially closed, the Authority was placed in "a normal posture," and no restrictions as to any funding activity could be imposed.

HUD then proceeded to give the THA over one million dollars in modernization funds and federal grants.

From 1974 to 1977, two individual complaints against the THA were filed, but one complaint was voluntarily withdrawn in 1975 and the other complaint was unsuccessfully resolved in 1976 after a conciliation conference at which the THA refused to sign the agreement presented by HUD. On May 14, 1976, HUD sent a letter to the complainant indicating that she was free to sue the THA in court. No further action was taken until 1978.

In 1978, HUD conducted two more reviews of the THA. One was a general compliance review; the other was the result of an individual complaint brought by a black woman who claimed she was denied an opportunity to rent an apartment in the white section of THA's housing projects

because of her race. The general compliance review was conducted in June, 1978, by Angeles Ramos. HUD's letter to the THA after this review demonstrated that conditions were virtually identical to those found in previous years. Six of the nine projects were one hundred percent racially identifiable. The remaining three were clustered into black and white groupings. HUD found that since 1974, the THA had not integrated *one single project,* and had not "housed a Black or White in the same building even though some buildings have as many as eight units."

In investigating Vernetia Friend's individual complaint against the THA, HUD discovered that she was told there were no vacancies at Bramble Courts when vacancies in fact existed. One of the THA staff members openly acknowledged that Friend was asked to take a unit at Ozan Courts, an all-black project, because the black section of Bramble Courts was filled. Another black applicant who noted a preference for Bramble Courts was also assigned to Ozan Courts.

As in compliance reviews in 1969, 1971 and 1974, the THA's Record of Applications contained numerous errors: over one hundred entries were reviewed that did not correspond to actual practice. THA Executive Director McCarley continued to "exercise his authority to apply the rules as he [saw] fit * * * systematically arriv[ing] at decisions which * * * perpetuate[d] a pattern of segregation in tenant assignments." Tenant assignments were the same as they had been for a decade: of the 136 assignments made from January, 1977, to December, 1978, black applicants were offered units only at locations predominated by blacks or where blacks were clustered or grouped. Moreover, whites were on the waiting list an average of forty-six days less than blacks, although units occupied by whites remained vacant fifteen *more* days than units occupied by blacks. Those projects that included blacks and whites

remained carefully segregated among buildings. For example, HUD found that

> [a] decision to systematically convert units 395 through 402 at Union Village from white to black occupancy appears to have been made in December 1976. Records indicate that from December 1976, to June 1977, white tenants moved out and the units remained vacant until July 1977, when only black tenants began to fill vacancies.

These two reviews in 1978 effectively demonstrated that "[t]here would be 100% segregation [throughout THA's projects] except for Arither Simpson", a black project manager who lived in the white area of Union Village. HUD was again presented with direct evidence of discriminatory intent: Willie M. Stephens, a white staff member who had been with the THA at least since 1969, stated that she "was instructed to rent to whites in the white area and to Blacks in the black area" when she was initially hired and that she has "continued to do so." Executive Director McCarley offered his views that whites were neater than blacks and that blacks and whites did not like to live with each other.

HUD found that black projects suffered from neglect "in spite of constant and numerous complaints resulting from faulty original construction," and there was "no evidence" that needed repairs would be made. Moreover, the working conditions of the black THA employees were discriminatory. Arither Simpson, a black woman, managed the all-black projects for the THA. HUD officials reported that she had a separate office in Ozan Courts, which lacked the amenities of "carpeting, drapes, and adequate maintenance and modern equipment." She managed forty-two percent of the THA's units and was required to keep a duplicate set of records, yet she was paid less than others with similar work loads and responsibility. Her supplies were "meted out" in a "humilitating and disrespectful" manner, and her personal mail was opened.[17]

---

17. Simpson never participated in a staff meeting and was not allowed to use petty cash for

coffee, but the three white females who worked at Bramble Courts had coffee twice a day with

HUD finally took some action to attempt to rectify the pervasive discrimination in Texarkana. In August, 1978, it withheld approval of a Urban Development Action Grant (UDAG grant) which the City of Texarkana had applied for on the grounds that the City was in violation of Section 8 and Community Development Block Grant regulations and that the THA was in noncompliance with Titles VI and VIII. On August 2, 1978, the city manager argued that HUD Representative Ramos had told the THA that "his 'gut feeling was that Texarkana's housing authority *is* in compliance.'" Ramos disclaimed making such a statement, and after HUD indicated that the THA was in noncompliance, the City wrote the THA requesting it to appoint a minority person to the Board and to take steps to ensure that housing practices were nondiscriminatory. The City reminded HUD that it had only limited control over the THA, however, and asserted that "only you at HUD—through your decisions regarding funding of renovation and expansion programs—can really [influence the THA]."

Further meetings between HUD and the THA were held; on October 27, 1978, THA Executive Director McCarley sent a letter to HUD indicating that the Board had approved a Plan for Demonstration of Compliance with Title VI.[18] The plan did not allow transfers of tenants between projects because of the "increased maintenance," however, unless McCarley found a "hardship" case. Ignoring the THA's failure to implement previous "plans," HUD sent a letter to McCarley on November 2, 1978, which found the THA in compliance if the plan were followed. Ironically, Angeles Ramos filed a report concerning the June, 1978, compliance review that same day

which concluded that it was "simple to see" that the THA's adopted Methods of Administration had "not been followed but rather circumvented." The report continued:

> After nine years of compliance reviews, complaint investigations and compliance review follow-ups, [the THA] still continues to practice what they were doing in 1969, even though they have adopted various resolutions, statements of policy and a modified Plan "B" of their M.O.A. *It appears that it has merely been a paper exercise.* [Emphasis added.]

That same month another vacancy occurred on the THA Board of Commissioners. It was filled by a white male.

On December 12, 1978, HUD Representative Ann Chud filed her report concerning the individual complaint of Vernetia Friend. Although Chud's thorough report contained direct evidence of intentional segregation and stated that the THA was not in compliance with Title VI or Title VIII, HUD merely negotiated a conciliation agreement with the THA regarding the individual complaint.

On January 23, 1979, HUD's Fair Housing and Equal Opportunity (FH & EO) Division notified the City of Texarkana that it still was ineligible for UDAG assistance because of insufficient progress on the part of the City itself and because of insufficient evidence concerning the implementation of THA's October, 1978, Compliance Plan. On February 3, HUD sent another letter to the City suggesting that a minority member on the THA Board of Commissioners would help the City become eligible for the UDAG grant. The City wrote the THA Board in April as requested but again reminded HUD that its assistance in achieving compliance by the THA was required.

---

Executive Director McCarley and often discussed business matters with him during this time.

**18.** This plan provided that the THA would "continue" not to discriminate in tenant assignments and employment and would "continue" to categorize tenants according to size of unit and to assign units on a "first come," "first served" basis *except* that the THA retained its authority to utilize "preference" and "hard-

ship" determinations. The THA also agreed to "give priority to minorities in projects where their race does not predominate" in making new assignments, but no goals were established and no transfers allowed for existing tenants except on a hardship basis. Finally, the agreement provided for methods of publicizing the Authority's policies and instructing employees as to those policies.

The THA's first "compliance report" pursuant to its plan was filed in August, 1979, over six months late. THA Executive Director McCarley wrote a letter which stated that the THA was following the October, 1978, Compliance Plan. Because of the lack of information received from the Authority, HUD conducted a review itself in September, 1979.

On September 27, HUD Equal Opportunity Specialist Margaret Wells filed a memorandum concerning her visit to the THA. She noted that two black applicants had been assigned to Hacota Homes and Highpoint, two projects that had previously been all-white. She also determined that several blacks had been assigned to Bramble Courts. Finally, Wells noted that two blacks had been assigned to previously all-white areas within Project 15–9, Union Village. As of September, 1979, the THA's projects were occupied as follows:

| Project Number | Name | Number of Units | Racial Composition – 1979 |
|---|---|---|---|
| 15–1 | Ozan Courts | 80 | 100% black |
| 15–2 | Bramble Courts | 80 | 59 white/14 black |
| 15–3 | Carver Courts | 40 | 100% black |
| 15–4 | Highpoint Courts | 40 | 36 white/ 1 black |
| 15–5 | George Johnson Homes | 20 | 100% black |
| 15–6 | Hacota Homes | 20 | 18 white/ 1 black |
| 15–7 | Inghram Homes | 30 | 100% black |
| 15–8 | Hacota II | 10 | 100% black |
|  |  | 20 | 17 white/ 3 black* |
| 15–9 | Union Village | 62 | 33 white/29 black* |

*Project substantially segregated by race among buildings.

Based upon these figures, Wells concluded that the THA was in substantial compliance with Title VI.

On September 29, 1979, Katie Washington of HUD's FH & EO Division reviewed the City of Texarkana's UDAG application status in light of information supplied by the City on September 19. Washington examined the same occupancy figures as Wells, and concluded that the projects were still segregated. Washington noted that the THA had also declined to take advantage of an opportunity to apply for additional family units, although there was a need for such units in the Texarkana area. Her report concluded that the City remained ineligible for a UDAG grant, and added that "[w]e have been advised that a law suit is to be filed against the Department and the Housing Authority for failure to insure minority representation on the Housing Authority's Board of Commissioners."

In October, 1979, the first minority person was appointed to the THA Board of Commissioners. The appellants' suit was commenced in November, 1979. HUD wrote to the THA stating that it was making "some progress" in implementing its 1978 Compliance Plan in December, but two months later wrote another letter explaining that a determination of the status of the Authority was not made in December because the case, together with all the exhibits, had been transmitted to the FH & EO Office in Washington, D.C. The letter then stated that the FH & EO Division had determined that the THA was in noncompliance with Title VI.

In March, 1980, the FH & EO Division in Washington wrote a memorandum to HUD Regional Director Leonard Chaires, which indicated that if the THA did not comply within ten days, "we are prepared to initiate enforcement action against the Authority." [19] Such an enforcement action was

19. The THA's new Executive Director, E.N. Pardue, also forwarded a report to HUD in March, 1980, concerning the occupancy patterns of THA's projects from September, 1979, through March, 1980. This letter indicated that beginning in October, 1979, a new method of assigning tenants had been implemented.

ultimately instituted by the Civil Rights Division of the Justice Department pursuant to 42 U.S.C. § 3613. This action was settled by a consent order, which required nothing of the THA other than that it "continue" to comply with the law.[20]

HUD conducted a final review of the THA in 1981. A memorandum entitled "Additional Information Required for Litigation in the Matter of the Local Housing Authority of the City of Texarkana, Ark." concluded that "since the last review, the Housing Authority of the City of Texarkana, Arkansas, is making an effort to effectuate Fair Housing and Equal Opportunity." [21]

To summarize, this is not a case in which a single decision by the agency had a discriminatory impact. Rather, faced with blatant segregation and an admitted determination to intentionally discriminate, HUD did nothing to effectively change the operation of the THA. HUD's finding of noncompliance in 1969 was ignored by the THA and after an exchange of letters was forgotten by the agency. Prodded into action by congressional inquiries in 1971, the agency found identical conditions. More letters were exchanged, a resolution was passed, and more funds were released. The same was true in 1972 and 1973.

After the HUD Regional Office concluded that the THA was still in noncompliance with Titles VI and VIII, was "nonresponsive" to any attempts to alleviate the discrimination, and was not even negotiating with them in good faith, these officials recommended that certain modernization

20. *See* note 4, *supra.*

21. The report contained the following information concerning occupancy patterns and vacancies as of March, 1981:

| Project Number | Name | Number of Units | Racial Composition 1981 |
|---|---|---|---|
| 15–1 | Ozan Courts | 80 | 100% black |
| 15–2 | Bramble Courts | 80 | 36 white/44 black |
| 15–3 | Carver Courts | 40 | 1 white/39 black |
| 15–4 | Highpoint Courts | 40 | 31 white/ 9 black |
| 15–5 | George Johnson Homes | 20 | 100% black |
| 15–6 | Hacota Homes | 20 | 16 white/ 4 black |
| 15–7 | Inghram Homes | 30 | 100% black |
| 15–8 | Hacota II* | 30 | 17 white/12 black |
| 15–9 | Union Village | 62 | 24 white/38 black |

*Not differentiated by area as in past reports.

**VACANCIES: 3/80–3/81**

| Project Number | Name | Total Vacancies Filled | Whites | Blacks |
|---|---|---|---|---|
| 15–1 | Ozan Courts | 15 | 0 | 15 |
| 15–2 | Bramble Courts | 45 | 9 | 36 |
| 15–3 | Carver Courts | 7 | 1 | 6 |
| 15–4 | Highpoint Courts | 26 | 8 | 18 |
| 15–5 | George Johnson Homes | 1 | 0 | 1 |
| 15–6 | Hacota Homes | 1 | 0 | 1 |
| 15–7 | Inghram Homes | 6 | 0 | 6 |
| 15–8 | Hacota II | 3 | 0 | 3 |
| 15–9 | Union Village | 23 | 4 | 19 |

funds be withheld from the THA. HUD Area officials appealed to higher authorities in 1974, and HUD responded to the request by releasing the funds in question and by finding that the THA was in compliance with the law. This action restored the THA to a "normal posture" and allowed it to receive $1,475,528 in modernization funds and grants from 1974 through 1978 without restriction.

HUD officials who had been associated with the Texarkana case since 1969 vigorously protested the agency's decision to find the THA in compliance, but were overruled. Even if the agency had determined that release of the modernization funds was warranted, alternatives were available. The agency could have released the modernization funds on the condition that the modernized units be filled on an integrated basis. The agency also could have referred the case to the Justice Department, as it ultimately did after the appellants initiated their suit. At the very least, HUD could have refused to find the Authority in compliance with Title VI, when it was obvious that blatant violations existed.

Conditions did not improve and, in 1978, HUD again found that the THA had failed to integrate a single project. Nevertheless, the agency simply recommended that the THA pass another resolution, even though the official who conducted the review of the THA concluded that for nine years the THA's resolutions in response to HUD investigations had "merely been a paper exercise." The agency's FH & EO Division took some positive action in 1978 by finding that the City of Texarkana was ineligible for a UDAG grant, in part because of the THA's segregated housing projects. Although a HUD report in 1979 concluded that the THA had made "substantial progress," the FH & EO Division "reached a different conclusion" and found that the THA remained in noncompliance.

The Court recognizes that since 1979 conditions in the THA housing projects have improved. The entire record prior to the commencement of the appellants' suit, however, reveals that for over a decade, HUD consistently responded to its own findings of noncompliance in ways that allowed the THA to continue discriminating. HUD argues that its actions were an inevitable consequence of its legitimate desire to provide low income housing, but the agency did not have to approve, support, and lobby in favor of the THA's discrimination in order to provide adequate low income housing in this case. Suggestions of actions short of a funding cutoff were often made by HUD officials, but the agency ultimately rejected or ignored them, choosing instead to pursue a course of conduct that "aggravated rather than alleviated" the discrimination in Texarkana. *See Columbus Board of Education v. Penick, supra,* 443 U.S. at 461, 99 S.Ct. at 2948.

In our view, the only reasonable inference that can be drawn is that HUD's actions were motivated at least in part by a discriminatory purpose. It is inconceivable that HUD would have so frequently acted to approve the THA's actions for so long unless its officials held the view that segregation and discrimination were acceptable. The possible neutral explanations for the agency's actions concerning changes in the THA's operation—a lack of resources or a desire to supply funds for low income housing—do not sufficiently negate the strong inference of discriminatory purpose that arises from the objective evidence contained in the agency's own files.

We do not suggest that HUD officials were motivated by malice, but we do believe that this record compels a conclusion that they acted at least in part because of a discriminatory purpose. Moreover, we find that the recent improvements do not excuse the agency's previously unconstitutional conduct. The district court's finding to the contrary is clearly erroneous. Accordingly, we reverse the district court and hold that HUD is liable to the appellants for its violation of the fifth amendment.

## III. TITLE VI

The appellants also argue that the district court erred in its finding that HUD is not liable under Title VI. The district court

determined that Title VI did not create a private cause of action against a federal funding agency, and held that even if it did, the appellants could not recover because they failed to exhaust their administrative remedies and failed to prove intentional discrimination on the part of HUD officials.

▆ There is a great deal of controversy concerning whether Section 601 of the Civil Rights Act of 1964 [22] creates an implied cause of action against a federal funding agency. Although there is considerable precedent which supports the view that a private cause of action exists against a federal funding recipient,[23] courts have disagreed as to whether such an action is also available against a federal funding agency.[24] *Compare Montgomery Improvement Ass'n, Inc. v. United States Department of Housing and Urban Development,* 645 F.2d 291, 294–297 (5th Cir.1981); *Gautreaux v. Romney,* 448 F.2d 731, 732 (7th Cir.1971); *Young v. Pierce,* 544 F.Supp. 1010 (E.D.Tex. 1982), *with NAACP v. Medical Center, Inc.,* 599 F.2d 1247, 1254 n. 27 (3d Cir.1979); *Community Brotherhood of Lynn, Inc. v. Lynn Redevelopment Authority,* 523 F.Supp. 779, 782 n. 2 (D.Mass.1981). Moreover, while some courts have held that intentional discrimination is necessary in order to establish a Title VI violation, others have determined that discriminatory impact or effect is sufficient. *Compare Guardians Ass'n of New York City Police Department, Inc. v. Civil Service Comm'n,* 633 F.2d 232, 273 (2d Cir.1980), *cert. granted,* 454 U.S. 1140, 102 S.Ct. 997, 71 L.Ed.2d 291 (1982); *Cannon v. University of Chicago,* 648 F.2d 1104, 1106–1107 (7th Cir.1981), *with NAACP v. Medical Center, Inc.,* 657 F.2d 1322, 1329–1331 (3d Cir.1981) en banc); *Guadalupe Organization, Inc. v. Tempe Elementary School District No. 3,* 587 F.2d 1022, 1029 n. 6 (3d Cir.1978).

In this case, we have already held that HUD's actions were motivated—at least in part—by a discriminatory purpose. In addition, in examining the results of the decisions made by the agency with respect to the operation of Texarkana's public housing program, we have found that the agency consistently chose courses of action which allowed the THA to continue discriminating. Nevertheless, because of the controversy surrounding the interpretation of Title VI, and because HUD is liable to the

22. Section 601, 42 U.S.C. § 2000d, provides:
No person in the United States shall, on the ground of race, color, or national original, be excluded from participation in, be denied the benefits of, or be subject to discrimination under any program or activity receiving Federal financial assistance.
Enforcement of section 601 by federal agencies is mandated by section 602, 42 U.S.C. § 2000d–1, which directs each federal agency to effectuate the provisions of section 601 through the issuance of rules and regulations consistent with the objectives of that section. Compliance by recipients of federal funds may be effected by (1) the termination of or refusal to grant funding assistance, or (2) by any other means provided by law.
Section 603, 42 U.S.C. § 2000d–2, authorizes judicial review of agency actions taken pursuant to section 602 "in accordance with section 10 of the Administrative Procedure Act." If the agency's actions are found to be irrational, unsupported by the record, or an abuse of discretion, the case can be remanded to HUD for further administrative proceedings. *Adams v. Richardson,* 480 F.2d 1159, 1163 (D.C.Cir.1973) (en banc).

23. *See generally Cannon v. University of Chicago,* 441 U.S. 677, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979); *Regents of the University of California v. Bakke,* 438 U.S. 265, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978); *Lau v. Nichols,* 414 U.S. 563, 94 S.Ct. 786, 39 L.Ed.2d 1 (1974). In *Cannon v. University of Chicago, supra,* the Supreme Court held that an implied cause of action under section 901 of Title IX of the Education Amendments of 1972 existed against a recipient of federal funds. Title IX was modeled after Title VI, and the Court discussed Title VI throughout its opinion. The *Cannon* Court noted that lower courts had found an implied cause of action under Title VI, *id.* at 441 U.S. at 696 n. 21, 99 S.Ct. 1957 n. 21, and indicated that the Supreme Court itself had twice reached the merits of suits under Title VI. *Id.* 441 U.S. at 702 n. 33, 99 S.Ct. at 1960 n. 33.

24. The *Cannon* Court stated that the final form of Title VI, while "conducive to implication of a private remedy against a discriminatory recipient," was "arguably *less* conducive to implication of a private remedy against the Government (as well as the recipient) to compel the cutoff of funds," *id.* 441 U.S. at 715 n. 51, 99 S.Ct. at 1967 n. 51, but plaintiffs in this suit do not seek a funding termination.

plaintiffs regardless of how we answer the questions raised under the statute,[25] we decline to reach the issue of the agency's liability under Title VI.

## IV. TITLE VIII

■ The remaining question concerns whether HUD is liable under Title VIII. Section 801 of Title VIII of the Civil Rights Act of 1968, 42 U.S.C. § 3601, states that "[i]t is the policy of the United States to provide, within constitutional limitations, for fair housing throughout the United States." Section 808(e)(5), 42 U.S.C. § 3608(e)(5), directs the Secretary of HUD to "administer the programs and activities relating to housing and urban development in a manner affirmatively to further the policies of [fair housing]."

HUD has promulgated various regulations to promote fair housing pursuant to Titles VI and VIII, which it enforces primarily through compliance reviews and complaint investigations under Titles VI and VIII. HUD alleges that it has taken numerous measures to promote nondiscrimination at the THA. The agency also cites the Justice Department's Title VIII action against the THA, which the agency claims is further evidence that HUD has fulfilled its duties under the statute.

Because we have found HUD liable for a constitutional violation, it certainly cannot have met its responsibility to promote fair housing. *See Resident Advisory Board v. Rizzo,* 425 F.Supp. 987, 1013–1018 (E.D.Pa. 1976), *aff'd in part, rev'd in part on other grounds,* 564 F.2d 126 (3d Cir.), *cert. denied,* 435 U.S. 908, 98 S.Ct. 1457, 55 L.Ed.2d 499 (1977). As the district court in *Resident Advisory Board v. Rizzo, supra,* noted, Congress enacted section 3608(e)(5) to cure the widespread problem of segregation in public housing. This problem was aptly characterized by Senator Brooke:

> Rarely does HUD withhold funds or defer action in the name of desegregation.
>
> \*    \*    \*    \*    \*    \*

In other words, our Government, unfortunately, has been sanctioning discrimination in housing throughout this Nation.

114 Cong.Rec. 2281 & 2527–2528 *cited in Resident Advisory Board v. Rizzo, supra,* 425 F.Supp. at 1014.

Even if HUD were not liable under the fifth amendment, the facts here demonstrate that HUD failed to carry out its affirmative duty to "institute action the direct result of which was to be the implementation of the dual and mutual goals of fair housing and the elimination of discrimination in that housing." *Banks v. Perk,* 341 F.Supp. 1175, 1182 (N.D.Ohio 1972), *aff'd in part, rev'd in part on other grounds,* 473 F.2d 910 (6th Cir.1973) (citations omitted).

■ We recognize that HUD has great discretion in choosing methods to achieve national housing goals, *Shannon v. United States Department of Housing and Urban Development,* 436 F.2d 809, 819 (3d Cir.1970), but for the reasons discussed above, *see supra,* at 1420–1421, we believe in this case that HUD's actions represent "a clear error of judgment" that is in fact unlawful. *See, e.g., Alschuler v. Department of Housing and Urban Development,* 686 F.2d 472, 481 (7th Cir.1982); *Garrett v. City of Hamtramck,* 503 F.2d 1236, 1247 (6th Cir.1974); *Shannon v. United States Department of Housing and Urban Development, supra,* 436 F.2d at 819–820.

## V. REMEDY

We remand to the district court with directions to it to determine a specific remedy that will be sufficient to correct the consequences of HUD's discriminatory conduct. *See Gautreaux v. Pierce,* 690 F.2d 616, 621–624 (7th Cir.1982); *Gautreaux v. Chicago Housing Authority,* 690 F.2d 601, 609 (7th Cir.1982); *Garrett v. City of Hamtramck, supra,* 503 F.2d at 1237–1250. This remedy should direct HUD to issue orders that will require the THA to desegregate all of its housing projects with all deliberate

---

**25.** These questions include: (1) whether there is an implied right of action against a federal funding agency under section 601; and if so,

(2) whether exhaustion of administrative remedies is required; and (3) what standard is appropriate to establish a Title VI violation.

speed. In our view, this goal can be accomplished in a period of two or three years if HUD requires the THA to fill vacancies as they occur so as to further the integration of the projects. In this regard, we emphasize that the consent orders previously issued are not to limit the court's discretion in any way. Specifically, prompt desegregation of all THA projects is not to be conditioned on either the allocation of funds by HUD for additional low income housing units or the construction of new units.

We recognize that the THA is not a party to this action, but we have no reason to believe that the THA will refuse to comply with a specific directive issued by HUD at the direction of the district court. If the THA does refuse to abide by HUD's directive, an appropriate action may be commenced in district court to secure compliance. Moreover, if the THA decides that it desires to participate in the proceedings before the district court concerning the appropriate remedy, it shall, upon proper motion, be given that opportunity. *Cf. Gautreaux v. Chicago Housing Authority, supra,* 690 F.2d at 606. Finally, the district court shall retain jurisdiction until such time as the remedy it orders is fully implemented.

## VI. CONCLUSION

In summary, we reverse the district court's decision dismissing the appellants' complaint. We hold that the district court's finding of a lack of discriminatory purpose is clearly erroneous: the objective evidence contained in HUD's own files mandates the conclusion that the agency's officials acted because of a discriminatory purpose. Thus, we hold that the appellees are liable under the fifth amendment. With respect to the statutory causes of action asserted by the appellants, we decline to reach the question

of HUD's liability under Title VI, but we reverse the district court's holding concerning Title VIII. We find that HUD officials have not fulfilled their duty under Title VIII and hold that the appellees are therefore liable under that statute as well.

Accordingly, we remand to the district court with directions to fashion an effective remedy to eradicate the effects of over a decade of discrimination in Texarkana.

HENLEY, Senior Circuit Judge, dissenting.

I agree with the court's conclusion that it is at least doubtful that an implied right of action against a federal funding agency exists under the Civil Rights Act of 1964, but I find no liability under the fifth amendment or under Title VIII of the Civil Rights Act of 1968, and in any event I cannot fully accept the terms of the court's mandate on remand.

## FACTS

As the court noted, HUD conducted its first compliance review in May, 1969. The report submitted by HUD investigator John M. Nelson concerning this review relates that the THA Executive Director admitted that THA public housing was segregated. More important with respect to the ultimate finding of liability here, the report also states, "No objection was offered to trying to integrate...." Indeed, the follow-up letter written by HUD's Assistant Regional Administrator notes that the THA agreed to implement all the specific recommendations made by HUD. Certainly, the absence of any objection to integration and a positive response to HUD's recommendations did not require further agency action at this juncture.[1]

---

1. In discussing the 1969 compliance investigation the majority refers to Nelson's remarks concerning hardship determinations in the investigative report. *See* 1411 n. 11. The report, which documents only one example of a tenant assignment made on the basis of hardship, notes that an elderly white woman who was relocating to Texarkana was assigned to an apartment at Bramble Courts two days after submitting an application for low income hous-

ing. Although the purport of Nelson's statement that "[n]o consideration was given to previous filing applicants of which many were Negroes," is that a discriminatory motive governed this assignment, it bears noting that several offers of this apartment made by the THA were refused because it had an inside location. Considering the rather cryptic nature of the investigator's statements and the meager evidence contained in his report, agency action on

When the February, 1971 compliance investigation resulted in a finding of noncompliance with Title VI, one HUD official advised the THA of HUD's reluctance to provide any further funding for either new construction or modernization of THA projects. As the majority notes, HUD Area Director Babbitt also wrote to the THA Board demanding that it comply with its adopted Tenant Assignment "Plan B" in making all future tenant assignments, suggesting that the Board adopt certain procedures relating to such assignments, and advising that all THA housing project funds would be deferred until a compliance investigation showed that the THA was complying with Title VI. By proposing that the THA adopt the tenant assignment procedures enumerated in his letter Babbitt in no way intended to convey that a mere paper resolve would bring the THA into compliance. That he did not have such a facile solution in mind is obvious from his deferral of all further funding until the THA complied with the requirements of Title VI. Likewise, Babbitt's release of funds after the March 23 compliance check revealed that "the Texarkana Authority [was] beginning to implement some of the procedures necessary for compliance with Title VI" was not designed to abet the THA's cause. Rather, the evidence of record demonstrates that his purpose in attempting to secure the funding in question was to provide adequate housing for all low income persons without regard to race. Two internal memoranda written before Babbitt's second letter to the THA are particularly instructive. A handwritten memorandum dated March 25, 1971 from Thomas Broadwell to A. Maceo Smith and Harold A. Odom states,

Dr. Babbitt does not feel like saying the door is open—if you do these things—we feel you're in compliance.

Dr. Babbitt's approach is to advise them they've been in non compliance for several years and that a recent investigation disclosed they were still in non compliance. Within five weeks [of the February, 1971 compliance review] another visit was made [the March 23 visit] and indications were evident of some slight improvement. Based upon the fact that he (Dr. Babbitt) did not want to continue withholding funds which would naturally improve the community they were approving certain projects.

Another memorandum dated March 26 from William "Sonny" Walker to Smith explains Babbitt's desire not to create an open door to HUD funds. It states as follows:

Mr. Babbitt does not want to take any position or make any recommendation that cannot be supported by HUD guidelines and conceivably weaken our ability to enforce the full intent of Title VI.

You will note that Mr. Babbitt's [second] letter [to the THA] provides for us to work with Texarkana on a continuing basis, along with the submission of monthly progress reports detailing compliance with Title VI. In essence, this means that we will not give them a 'clean bill' in exchange for any immediate paper promises, but we will, on a continuing basis, suggest certain action that will assist them in fully complying with the intent of the law.

Hopefully, we will accomplish such things as minority group board members, tenant councils, and desirable initial occupancy of new projects through close monitoring and Equal Opportunity Staff assistance.

The circumstances surrounding deferral of $21,053.00 in additional modernization funds after the 1973 compliance review resulted in a determination of noncompliance with Title VI and Title VIII also deserve mention. Significantly, HUD Area Director Barber was prompted to request the release of the $21,053.00 only after the THA Executive Director advised the HUD Little Rock Area Office on April 22, 1974 that ten units at Ozan Courts, where a $731,000.00 modernization program had been completed only several weeks earlier, had developed

this matter hardly seemed warranted. In any event, HUD issued a specific recommendation addressing tenant assignment on the basis of

hardship, which was adopted by the THA Board of Commissioners in August, 1969.

roof leaks following heavy rains. In his May 23 memorandum apprising Regional Administrator Morgan of the situation Barber explained,

> Our Maintenance Engineer and the Construction Analyst both, after field visits, are in agreement that reroofing is essential if the money spent in the modernization program is to be protected. These roofs are the built-up type over twenty years old, and continuous water damage because of roof leakage will result in serious damage to the renewed living units.

> \* \* \* \* \* \*

> Normally, we would not press an issue of this nature, but there is a $700,000 investment that will deteriorate rapidly if some action is not taken soon.

After receiving Barber's memorandum Morgan evidently sent it to Lloyd D. Clapsaddle, the Assistant Regional Administrator, who contacted Acting Assistant Regional Administrator for Equal Opportunity Leonard Chaires to request his comments on the matter. Clapsaddle also offered the following recommendation:

> Considering that $731,820 has already been committed to modernization of Project Ark–15–1 [Ozan Courts] and the additional $21,053 is available ... and urgently needed for roof repairs to prevent damage to dwelling units otherwise modernized, we would recommend release of the funds. Our recommendation, however, would be conditioned to provide that any application from the Authority for a new program, modernization or other, would not be considered until a compliance review is conducted by your office and resultant findings resolved.

At Chaires' direction, Thomas Broadwell then conducted the June, 1974 compliance review.

The court attempts to make much of the removal of strictures against HUD funding of THA projects. Its statement that "HUD then proceeded to give the THA over one million dollars in modernization funds and federal grants," gives the impression that HUD officials eagerly filled the agency trough with federal dollars and allowed the THA unbridled access. It bears noting, however, that one of HUD's principal goals in removing restrictions on federal funding was to prevent severe weather damage to recently modernized apartments at Ozan Courts.[2] As to the "giveaway" of additional federal monies, HUD's intent is clearly revealed in later correspondence between Leonard Chaires and the THA Executive Director. Chaires' letter, drafted shortly after the June, 1978 compliance review conducted by Angeles Ramos, stated,

> On August 1, 1974, this Office acting in good faith placed your Authority in substantial compliance. The rationale was that the LHA was receiving or about to receive various grants and therefore provide you an opportunity to integrate some of your projects [by relocating tenants of a project undergoing modernization to vacant apartments in other projects]. The facts are that you did receive approximately $1,475,528 in ... grants but you did not integrate one single project. You did manage to cluster or group.

After informing the THA of its noncompliance with Title VI, the letter additionally stated,

> If the Authority does not voluntarily comply or adopt and implement a plan adequate to accomplish the purpose of Title VI within 60 calendar days from the date of this letter, it will be necessary for this Office to refer this matter to the Assistant Secretary for Fair Housing and Equal Opportunity in Washington, D.C., with a recommendation that the Department begin administrative proceedings pursuant to Section 602 of Title VI of the Civil Rights Act of 1964 seeking the termination of Federal assistance for your Housing Authority.

---

**2.** Had HUD refused to modernize or repair Ozan Courts pending integration, paradoxically the black people who occupied Ozan might have been more free from discrimination but they would have been out in the rain.

It is noteworthy that the plan subsequently approved by HUD contained, *inter alia,* provisions to remedy the deficiencies in THA employees' knowledge concerning equal opportunity matters that Ramos noted in his final report of the June, 1978 compliance review. Like the confusion surrounding the use of hardship and preference ratings, *see* slip op. at 11 n. 13, the employees' lack of awareness of the requirements of Title VI, demonstrated by the following excerpt from Ramos' report, undoubtedly resulted in some of the improper tenant assignments and inaccurate documentation.

> All the administrative staff were given a written Employee Interview with the following responses to the questions ...:
>
> 1. What laws apply to nondiscrimination in housing at this LHA? Three did not know, one response was Civil Rights Act of 1966, another response was Civil Rights Act of 1964 and another answered with Fair Housing of 1968.
>
> 2. Does the LHA provide HUD assurance of nondiscrimination? Four responded 'yes' and two responded 'I don't know.'
>
> 3. If so, name the assurances? None provided the correct answer.
>
> 4. What coverage do the assurance[s] accord? No correct answers.
>
> 5. Have you received training in nondiscrimination by the LHA and when? The answer was no.
>
> 6. Please explain Fair Housing? No correct answers.
>
> 7. Purpose of Statement of Policies? No correct answers.
>
> 8. Purpose of M.O.A. and Plan adopted by LHA? Three answered 'I don't know' and three answered 'Plan B.'

Right answer should have been Modified Plan 'B.'

It is clear from the record that at HUD's insistence the THA not only explained the requirements of Title VI to its employees, but also agreed to dismiss or discipline any employee who failed to comply with the law.

### FIFTH AMENDMENT

The court's depiction of federal officials guided by a discriminatory purpose not only fails to mirror the evidence of record in this case but also contravenes the clear error standard that circumscribes this court's review of the district court's findings of fact. *Pullman-Standard v. Swint,* 456 U.S. 273, 102 S.Ct. 1781, 72 L.Ed.2d 66 (1982); *Rogers v. Lodge,* —— U.S. ——, 102 S.Ct. 3272, 73 L.Ed.2d 1012 (1982).

The record before us does not contain substantial objective evidence of discriminatory intent on the part of HUD officials. On the contrary, it "demonstrates that the federal defendants consistently attempted to promote nondiscrimination and fair housing on behalf of all minorities in Texarkana." *Clients' Council v. Pierce,* 532 F.Supp. 563, 570 (W.D.Ark.1982). HUD's actions during the ten year period in question can easily be "explain[ed] on nonracial grounds." *Washington v. Davis,* 426 U.S. 229, 242, 96 S.Ct. 2040, 2049, 48 L.Ed.2d 597 (1976). In attempting to achieve compliance with Title VI, HUD, faced with the frequently obstreperous THA, was effectively confronted with two choices: to fund or not to fund. HUD chose to continue funding, all the while endeavoring to foster nondiscrimination and fair housing by informal means pursuant to its own regulation, 24 C.F.R. § 1.7(d)(1) (1982). *See* 42 U.S.C. § 2000d–1 (1976). Contrary to any assertion that funding and other agency decisions were made "because of" their discriminatory effect,[3] the administrative rec-

---

**3.** It is evident from the majority's opinion that its finding of a constitutional violation is based almost entirely on the foreseeability of the segregative effect of decisions made by HUD officials and the claimed availability of alternative choices. Although the majority recognizes that "[d]isproportionate impact ... is not the sole

touchstone of an invidious racial discrimination," *Washington v. Davis,* 426 U.S. 229, 242, 96 S.Ct. 2040, 2049, 48 L.Ed.2d 597 (1976), its application of foreseeability comes perilously close to the forbidden formulation of "intent as [an] awareness of consequences," *Personnel Administrator v. Feeney,* 442 U.S. 256, 279, 99

ord demonstrates that HUD's actions were designed to provide access to adequate low income housing, which would inure to the benefit of black and white persons alike. This legitimate and worthy goal, apparent on the face of the record, cannot be discounted as readily as the majority suggests. While it may have been wiser, as a matter of constitutional policy, to withhold federal funds until the THA ceased its discriminatory practices, and deprive poor people, black and white, of housing, what is wise and what is constitutionally indispensable are not equivalent in the absence of proof of discriminatory intent. *See Village of Arlington Heights v. Metropolitan Housing Development Corp.,* 429 U.S. 252, 265–66, 97 S.Ct. 555, 563–64, 50 L.Ed.2d 450 (1977).

## TITLE VIII

From what has been said, it follows as well that the facts do not demonstrate a violation of Title VIII of the Civil Rights Act of 1968, 42 U.S.C. § 3608(e)(5) (Supp. IV 1980), any more than they demonstrate that HUD officials acted with a discriminatory purpose. HUD, the agency granted the discretionary authority to select the means to achieve fair housing, *Shannon v. United States Department of Housing and Urban Development,* 436 F.2d 809, 819 (3d Cir.1970), consistently attempted to "administer the programs and activities relating to housing . . . in a manner affirmatively to further the policies of [fair housing]," 42 U.S.C. § 3608(e)(5). Clearly, there is no

---

S.Ct. 2282, 2296, 60 L.Ed.2d 870 (1979). The majority's position appears to imply that because HUD presumably was aware of the disparate impact of its choices, the agency was constrained to either realize its goal of providing adequate low income housing by plodding along some other, undefined path or face a finding of liability under the fifth amendment. To the extent that the majority espouses the equation of foreseeability with intent, its position is untenable. *See, e.g., Personnel Administrator v. Feeney,* 442 U.S. at 279 n. 25, 99 S.Ct. at 2296 n. 25.

4. The propriety of a suit by a private party under Title VI to compel termination of funding appears particularly doubtful. In his separate opinion in *Regents of the University of Califor-*

Title VIII violation as a result of inaction or indolence here.

## TITLE VI—REMEDY

The court candidly recognizes the controversy as to whether Congress intended to create a private right of action against a federal funding agency under section 601 of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d (1976). Indeed, substantial doubt has been expressed whether such a right exists. *See Cannon v. University of Chicago,* 441 U.S. 677, 719, 99 S.Ct. 1946, 1969, 60 L.Ed.2d 560 (1979) (White, J. and Blackmun, J., dissenting); *Regents of the University of California v. Bakke,* 438 U.S. 265, 380–81, 98 S.Ct. 2733, 2794–95, 57 L.Ed.2d 750 (1978) (separate opinion of Mr. Justice White); *cf. NAACP v. Medical Center, Inc.,* 599 F.2d 1247, 1254 n. 27 (3d Cir.1979) (unequivocal determination that beneficiary of a federally funded program may not sue the federal funding agency). I, too, question whether an action against a federal administrative agency is available under section 601 of Title VI,[4] particularly in the circumstances of this case.

In my view, a considerable obstacle to the implication of a private right of action against HUD under Title VI is the lack of any effective remedy. The court concludes that HUD violated the fifth amendment and Title VIII essentially throughout the ten year period from 1969 to 1979 and directs the district court to "fashion an effective remedy to eradicate the effects of over

---

*nia v. Bakke,* 438 U.S. 265, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978), Mr. Justice White aptly stated,

Termination of funding was regarded by Congress as a serious enforcement step, and the legislative history is replete with assurances that it would not occur until every possibility for conciliation had been exhausted. To allow a private individual to sue to cut off funds under Title VI would compromise these assurances and short circuit the procedural preconditions provided in Title VI. *Id.* 438 U.S. at 382–83, 98 S.Ct. at 2795–96. Since appellants here are not seeking to compel funding termination, it is, of course, unnecessary to decide this question.

a decade of discrimination in Texarkana." [5] The difficulty with this approach is that any relief devised by the district court, including desegregation of all THA projects ordered by the majority, must necessarily and ultimately be directed at the THA rather than HUD, if it is to be effective in redressing past discrimination in THA projects.[6] The circumstances of this case, however, do not permit a remedy that encompasses the THA within its scope. Not only is the THA not a party to this action, but two valid consent orders, whose terms are not now before this court, also may preclude ordering any relief implicating the THA insofar as the same ten year period is concerned. Events postdating the consent decrees, including any violations thereof, are not, of course, completely governed by the terms of the decrees and can properly be the subject of a suit against the THA. In such a proceeding the district court would be free to take into account the decrees to the extent permitted or required by law. But there is simply nothing of consequence that HUD, this court or the district court can do in this proceeding to affect the consequences of HUD's past acts.[7] In present circumstances we should eschew a remand which directs the district court to do that which neither we nor it can do—fashion an effective remedy and then retain jurisdiction until the remedy is fully implemented.

## CONCLUSION

Finding neither liability nor effective available remedy, I dissent.

---

**5.** The remedy is, of course, also directed at redressing HUD's alleged constitutional violation during the same ten year period.

**6.** Indeed, the majority recognizes that any remedy fashioned by the district court, including an order requiring HUD to issue desegregation orders, will substantially affect the THA. It states, "[I]f the THA ... desires to participate in the proceedings before the district court concerning the appropriate remedy, it shall, upon proper motion, be given that opportunity."

**7.** This court at most could declare HUD's actions illegal and perhaps restrain or condition further funding. *But see* note 4 *supra.*