**N.A.A.C.P., BOSTON CHAPTER, Plaintiff,**

v.

**Jack KEMP, Secretary of Housing and Urban Development, et al., Defendants.**

**Civ. A. No. 78–850–S.**

United States District Court,
D. Massachusetts.

June 23, 1989.

Clarification and Amendment of
Judgment Sept. 14, 1989.

---

Natasha Lisman, Sugarman, Rogers, Barshak & Cohen, Boston, Mass., for plaintiff.

Christine Roach, Asst. U.S. Atty., Boston, Mass., for defendants.

### MEMORANDUM AND ORDER FOR JUDGMENT

SKINNER, District Judge.

The plaintiff N.A.A.C.P., Boston Chapter ("NAACP") seeks injunctive and declaratory relief, on the grounds that the Secretary and other officials of the United States Department of Housing and Urban Development (collectively "HUD") have failed to administer certain programs in the City of Boston "in a manner affirmatively to further the policies of [the Federal Fair Housing Act, Title VIII of the Civil Rights Act of 1968]" ("the Act"), in violation of HUD's obligations under 42 U.S.C. § 3608(e)(5).

### Background

The NAACP filed this action in April of 1978, both on its own account and as representative of blacks in Metropolitan Boston alleging that HUD had failed to carry out its statutory mandate to promote fair housing in connection with its administration of housing and community development programs in the City of Boston ("the City"). The plaintiff challenges HUD's granting of funds to the City under its Community Development Block Grant ("CDBG") and Urban Development Action Grant ("UDAG") programs, on the basis that its constituency has been and is being excluded from equal access to the benefits of the programs funded. The claim as to the CDBG funds is essentially that HUD has failed to impose and enforce adequate conditions in connection with its grants to the City to promote fair housing goals. The complaint as to the UDAG funds has focused on HUD's failure to use its leverage to cause the City to increase the supply of affordable desegregated housing.

A trial on the merits was commenced in 1982 after remand from the court of appeals reversing a judgment of dismissal of the UDAG claim. On April 27, 1983, I made findings of fact and rulings of law which are published at 567 F.Supp. 637 (1983), and are restated in summary fashion at 624 F.Supp. 1083, 1084–85 (1985).

In those decisions I concluded that HUD did not intentionally discriminate in administering its programs, and that the evidence did not warrant a finding that HUD financed City programs which were either intentionally discriminatory or had a discriminatory impact. Based on these findings and conclusions, I found that HUD had not violated § 109 of Title I of the Housing and Community Development Act of 1974, 42 U.S.C. § 5309, § 601 of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, or the Fifth Amendment to the Constitution.

I found that HUD was in violation of its own regulations, by continuing to furnish CDBG funds despite the City's failure to submit a Community Development and Housing plan identifying the "special needs" of the lower income population, required under 24 C.F.R. 570.300(b) ("the minority needs assessment"). This omission significantly impeded HUD's capacity to carry out its statutory mandate, prescribed by the Act, to promote fair housing in federally financed projects. The City supplied a minority needs assessment on September 7, 1982, thus permitting HUD to continue financing its programs in compliance with its own regulations.

This left only the issue of HUD's compliance with its mandate under 42 U.S.C. 3608(e)(5), to "administer the programs and activities relating to housing and urban development in a manner affirmatively to further the policies of [the Act]." While I found that HUD had failed its obligations in this regard, 624 F.Supp. at 1085 (D.Mass.1985), I believed that I had no legal authority to redress such omissions under the Administrative Procedure Act, 5 U.S.C. § 551, *et seq.* (the "APA"), because HUD's compliance with this section was committed to the agency's discretion pursuant to 5 U.S.C. § 701(a)(2) and would require essentially managerial decisions which courts are ill-equipped to perform.

As this was the only remaining claim, I dismissed the action.

The Court of Appeals for the First Circuit reversed my order dismissing the claim based on § 3608(e)(5), holding that the pattern of inaction which comprised the alleged violation was not exempted from review under the APA. In addition, the court discussed available remedies under the APA, and made it clear that I have broad discretion to tailor a remedy to the current circumstances. The court remanded the action, for consideration of appropriate remedies for HUD's violation of its statutory obligations, *N.A.A.C.P. v. HUD*, 817 F.2d 149, 160–1 (1st Cir.1987).

I stayed the action on July 4, 1987 and ordered the parties to participate in mediation proceedings under the auspices of the Community Relations Service of the Department of Justice ("CRS"). In a status conference held December 14, 1988 the parties reported that attempts to reach a resolution through mediation had failed, despite the heroic efforts of the mediators.

In accordance with the court of appeals' directive, I solicited submissions from the parties as to any developments in the housing situation in the City since the 1982 trial, and for suggestions as to an appropriate remedy. To this end, I directed the plaintiff to submit a motion for entry of judgment, together with a proposed decree.

The plaintiff has submitted such a motion, together with a proposed order setting forth the declaratory and injunctive relief it currently seeks. HUD has not submitted a counterproposal but opposes the plaintiff's motion on the grounds that it is not liable for any violation and that the relief requested is both beyond my power to award and inappropriate to the facts of this case.

### Current Conditions

In addition to failing to produce any agreement on remedy, the mediation proceedings were barren of useful information as well, in that no stipulations, factual findings by the mediator or any record derived from those proceedings has been made available to the court. The parties have been unable to reach any stipulations themselves as to the current situation. While the plaintiff has offered to submit testimony of an expert who would testify that barriers to open housing have not diminished since 1983, and that HUD has not played an active role in addressing those barriers, the sole evidentiary supplementation to the record before me is the affidavit of Harold Thompson, HUD's Deputy Regional Administrator in Boston, which is offered to report on HUD's conditioning and monitoring activities in the seven years since the trial.

In December of 1985, two of the housing projects for which the plaintiff sought approval, Winslow Court and Harbor (Columbia) Point, received financing through the interaction of HUD, the City and agencies of the Commonwealth of Massachusetts. In addition, the City has committed $31,000,000 of its anticipated $31,300,000 repayment from the Copley Place UDAG to the construction of Tent City, a project combining low and middle income housing with commercial use, located between Copley Square and the South End. Winslow Court is located in Roxbury. No specific information as to the percentage of black residents in these projects, or their income levels have been offered.

Of approximately $26 million in CDBG funds allocated to the City for FY 1981, HUD withheld $13 million of these funds, conditioning their release on the City's performance of certain actions, including the City Council's enactment of a fair housing ordinance and a home rule petition, or some equivalent enforcement activities; a minority needs assessment; and the design of activities to address minority housing needs and to set standards to assess minority housing benefits. In 1983, HUD determined that the City had fulfilled these conditions, and released the funds. Currently all but $33,000 of these monies has been spent or obligated by the City.

HUD has imposed no new conditions or assurances in connection with provision of CDBG or UDAG funds since the lifting of the CDBG conditions in 1983. It represents that it has recently monitored Boston's performance in the CDBG program

with respect to furthering fair housing and has found its performance to be acceptable. It further states that it has no evidence that the City has failed to comply with any legal requirements of either program with respect to fair housing since removal of those conditions and represents that it has no current intention to impose any conditions, assurances or other sanctions upon the City in connection with its receipt or expenditure of CDBG and UDAG funds.

As evidence of the City's commitment to fair housing, HUD cites its use of CDBG monies to fund the Fair Housing Commission, which was created in compliance with the 1981 conditions. The purpose of the commission is "to increase housing opportunities for minorities and female-headed [*sic*] households, and to reduce housing discrimination." However, HUD does not point to any evidence that these laudable goals have actually been furthered by the commission's activities, but contends that it has met its obligations to ensure enforcement of fair housing goals by "formally mandating the strengthening of the City's enforcement efforts as a condition to Boston's receipt of federal block funds." The plaintiffs maintain that the Commission lacks effective enforcement capability, since no legislation has been passed to give it the necessary jurisdiction and enforcement power and the commission operates on the basis of complaints only.

Thompson also reports statistics related to minority participation in various home improvement programs. No evidence has been submitted that the identified programs affect patterns of segregation, and they appear to be designed to provide assistance to individuals where they are currently located.

With the exceptions noted above, I shall assume that the conditions described in my previous findings of fact still obtain.

### Liability

In my prior opinions, I found that HUD had failed to satisfy the minimum levels of compliance required by § 3608(e)(5) in two respects. First, the agency did not require the City to establish an effective fair housing enforcement program in the face of its knowledge of pervasive racial discrimination in the City. Second, despite its knowledge that a housing emergency existed which had a disproportionate impact on low income black families, HUD did not condition its provision of federal funds, specifically UDAG funds on construction of affordable integrated public housing. 624 F.Supp. at 1085.

HUD has presented no new evidence which would warrant modification of my conclusion that it violated the minimal obligations imposed by its governing statute, 42 U.S.C. § 3608(e)(5).

As grounds for disputing liability, HUD contends that in its order remanding this action, the court of appeals commands me to adopt a narrower view of HUD's obligations and that under this lesser standard it must be found not liable. I find no support for HUD's position in the text of the court's opinion. HUD's argument that the court of appeals adopted a narrow test of liability, amounting to a "duty to consider" appears to be based on the court's discussion of *Anderson v. City of Alpharetta*, 737 F.2d 1530 (11th Cir.1984), a case on which the defendant relied in its argument for a narrow view of its liability. The court rejected this argument and held that the standard set forth in that case, "even if overly narrow, still does not support the government's view of HUD's duties." 817 F.2d at 156.

### Remedies

Pursuant to my order at the December, 1988 status conference, the plaintiff submitted a proposed final decree setting forth the declaratory and injunctive relief it seeks. HUD has filed no counterproposal, contenting itself with challenging the legitimacy and efficacy of any suggested remedy for the wrongs alleged.

In the absence of stipulations or compromise on remedy, I must rely on the findings and conclusions embodied in my prior decisions and the meager supplementation of the record filed by the parties in connection with this motion.

"Of course, the court faces the difficult task of avoiding both remedies that may be too intrusive, interfering with HUD's ability to carry out its basic grant-awarding mission, and those that may prove to be ineffective. This difficulty is not, however, unsolvable." *NAACP v. HUD, supra,* 817 F.2d at 159. In its order of remand, the court of appeals described my remedial powers under these circumstances with celestial generality.[1] I am empowered to review and remedy patterns of inaction under both sections 706(1) and 706(2)(A) of the APA. In the absence of any positive response from HUD, any meaningful dialogue between the parties or any guidance from the court of appeals, I must make an independent judgment as to which, if any, of the plaintiff's proposals will effectuate the purposes of the Act.

### 1. *Declaratory Relief*

■ The bulk of the declaratory relief requested tracks my 1983 findings of fact, specifically that HUD failed to comply with the minimal requirements of § 3608(e)(5) by failing to (1) promulgate regulations and guidelines setting forth standards for HUD's administration and the recipients' use of funds; (2) secure a minority needs assessment in a timely manner; (3) finance the increase of desegregated housing stock to give minority families meaningful choice of location, and (4) require effective fair housing enforcement by the City. These declarations are supported by my previous findings.

In addition the plaintiff seeks a declaration that metropolitan area relief is necessary, thus laying the groundwork for its proposal that HUD be obliged to assist urban black households to obtain access to publicly assisted housing in the City's suburbs. The support for this request is my 1983 finding that members of the plaintiff's constituency desire to relocate to the suburbs, in part due to the lack of safe housing in white urban areas, and that HUD has attempted to assist them in doing so. I did not make findings which would warrant a conclusion that HUD failed to carry out its obligations in connection with housing assistance beyond the City limits. At this point, however, the task is to delineate a broad remedial plan to redress the whole range of the defendant's default, which includes the failure to encourage the creation of desegregated housing to correct the deficiency in the City's housing stock. Measures designed to supplement that stock with affordable desegregated housing in the suburbs appear to me to be appropriate under these circumstances.

Accordingly a declaratory judgment shall enter as requested by the plaintiff.

### 2. *Injunctive Relief in General*

HUD argues for stringent limitations on the remedy I may devise, and raises a number of general and specific objections to the injunctive relief the plaintiff requests. HUD argues generally that the requested relief is beyond the relief authorized by the APA for three reasons.

■ First, it argues the funds at issue when this case was brought have already been disbursed, and therefore its allegedly improper acts or omissions are no longer redressable as a practical matter. To similar effect is HUD's position that changed circumstances generally have mooted the need for judicial relief, pointing to recent use of its grants and leveraging power to generate affordable open housing and its belief that the City is currently in compliance with its obligations.

Evidence submitted by HUD as to the City's recent use of its CDBG funds demonstrates that there have been attempts to address the needs of minority and lower-income individuals for affordable new and rehabilitated housing. However, there is no evidence as to the adequacy of these efforts to remedy the overall lack of an adequate supply of affordable *integrated* housing in Boston.

The fact that this litigation has been pending for over a decade is no reason to deny the plaintiff relief, particularly in the absence of any showing that conditions have substantially improved. Despite my

---

**1.** "The decision of the district court is vacated and the case is remanded for further proceedings consistent with this opinion." 817 F.2d at 161.

invitation, the defendant has not presented sufficient evidence to assure me that the conditions which gave rise to the suit have been adequately ameliorated, or that the proposed relief is unnecessary. On the contrary, the plaintiff maintains that there is still no meaningful enforcement mechanism in place because of the lack of enabling legislation which would give enforcement power to the Boston Fair Housing Commission.

Moreover, this case is distinguishable from the cases on which defendant relies because the conditions exacerbated by HUD's pattern of inaction apparently continue to exist and are currently remediable. This is not a case involving a single improper funding decision, for which there is no longer a viable remedy. *See, e.g., South East Lake View Neighbors v. HUD*, 685 F.2d 1027 (7th Cir.1982), holding that the plaintiffs lacked standing to enjoin federal funding when the project at issue was nearly completed, since the relief the plaintiffs requested would be valueless at that stage of the proceedings.

In addition, the fact that the 1977–81 funds have been disbursed does not deprive HUD of all leverage over its grantees. Its control of current and future grant funds gives the agency leverage to remedy past and current noncompliance with fair housing goals. *See, e.g.*, 42 U.S.C. §§ 5304, 5311; *Davis v. HUD*, 627 F.2d 942, 945 (9th Cir.1980), in which the court held that an action challenging HUD approval of a block grant was not mooted by the fact that the grantee had already received and expended the funds, since the grantee could be obliged to satisfy goals not met in the past in order to qualify for additional block grants; *see also, Clients' Council v. Pierce*, 711 F.2d 1406 (8th Cir.1983), in which a remedy directing HUD to issue orders to the local housing authority to desegregate its housing projects was not barred by the fact that the authority was not a party to the action, since the court had "no reason to believe that the [local authority] would refuse to comply with a specific directive issued by HUD at the direction of the district court." *Clients' Council, supra*, 711 F.2d at 1426.

Second, HUD argues that I am barred from fashioning a remedy which compels the agency to perform any act it is not independently obliged to perform under the FHA or its own regulations. HUD confuses the issue of liability with that of an appropriate remedy once liability is fixed. HUD's specific obligations under its governing statute and regulations are relevant to the question of liability. But once liability has been found, I am not limited in fashioning a remedy to ordering HUD to perform acts which would be required of it even absent a finding of past culpability. This is implicit in the concept of remedial action.

Third, HUD reinvokes its narrow construction of the order of remand, to argue that any relief must be narrowly tailored to impose a "duty to consider," since this is its "only conceivably 'plausible' violation." As I have already made clear, I do not agree with HUD that the order of remand fixes such a constricted view of its statutory obligations or of the range of available remedies.

In creating appropriate remedies, however, prudence requires the acknowledgement of certain political imperatives. The appropriation of funds for urban development is committed to Congress, and the allocation of such funds among the various sections of the country is committed to the discretion of the defendant. Imposition of restrictions that make Boston an unattractive candidate for federal funding may ultimately defeat the laudable purposes which the plaintiff seeks to achieve.

### 3. *Specific Remedial Measures*

(a) Funding of Additional Projects

█ Plaintiff seeks an order requiring the defendant to provide new funding for the construction of affordable desegregated housing and the increase of available rent subsidies, all to be allocated according to specifications to be supplied by the plaintiff. HUD argues that any decree which would require HUD to fund particular housing projects and supply rental subsidies are foreclosed by sovereign immunity, based on the distinction drawn between

"money damages" and "specific relief" set out in *Bowen v. Massachusetts*, —— U.S. ——, 108 S.Ct. 2722, 101 L.Ed.2d 749 (1988). The APA does not ordinarily empower a court to order an agency to fund particular projects or to reach particular results. *See, e.g., NAACP v. HUD, supra*, 817 F.2d at 160; *United States v. Yonkers Board of Education*, 594 F.Supp. 466 (S.D. N.Y.1984), contrasting suits to enjoin funding, which are authorized by the APA, with those to provide funding, which are not.

As I have pointed out, the appropriation of funds is exclusively a matter for the Congress and the allocation of funds among the various sections of the country is committed to the discretion of the Secretary. *N.A.A.C.P., Boston Chapter v. Harris*, 607 F.2d 514 (1st Cir.1979). I find that the portions of the proposed decree which seek to order HUD to provide funding are barred by sovereign immunity, and are inconsistent with the statutory scheme for the implementation of the UDAG and CBDG programs. Accordingly I am obliged to reject this suggested remedy.

### (b) Metropolitan Area Relief

The plaintiff seeks injunctive relief compelling HUD to require private landlords of HUD-assisted housing throughout the metropolitan area to participate in an affirmative marketing program targeting low income minorities now living in Boston. Such a program would be administered under the auspices of the Boston Fair Housing Commission. In my opinion this form of remedy is warranted because of (a) HUD's failure to encourage the construction of integrated housing within the City and (b) because there is a lack of safe housing for persons of color in the white areas of the City. The remedy sought is in my opinion a reasonable response to the conditions which I found to exist, even though I made no specific findings concerning suburban housing opportunities.

The requested order would not require the defendant to impose conditions on local authorities over which it has no control, *cf. Jaimes v. Toledo Metropolitan Housing Authority*, 758 F.2d 1086 (6th Cir.1985), nor to restructure units of local government, *cf. Milliken v. Bradley*, 418 U.S. 717, 94 S.Ct. 3112, 41 L.Ed.2d 1069 (1974). In my opinion, an order requiring the defendant to condition the federal funding of private suburban housing projects is legal, feasible and an appropriate remedy for the defendant's default. *Hills v. Gatreaux*, 425 U.S. 284, 305–6, 96 S.Ct. 1538, 1550, 47 L.Ed.2d 792 (1976).

### (c) Fair Housing Conditions

The plaintiff seeks an order that HUD impose a series of Fair Housing Conditions on the City and Commonwealth, under any grant programs wherein it has power to impose conditions on grantees. These conditions include promulgation of legislation eliminating the current exemption of five or fewer unit housing from the reach of The Fair Housing Ordinance, and granting the Fair Housing Commission enforcement powers; the participation of all managers and owners of state or City assisted housing in the metropolitan area in rental assistance and affirmative marketing programs; and the implementation of an enforcement program.

HUD argues that the plaintiff lacks standing to seek relief from these entities, because they are not defendants in this action. This argument fails for the same reason as HUD's previous standing argument, i.e., the relief sought is obtainable from HUD, which is a party to this action. At least insofar as the conditions requested promote integrated fair housing, they are permissible.

HUD further argues that it cannot legally condition its grants to the Commonwealth and the City, because the Act and applicable regulations require as a prerequisite to conditioning that the grantee be found to have failed to comply with its duties.

Section 5304(d) gives the Secretary the power to deal with a grantee's current and future performance. This provision requires the Secretary, on at least an annual basis, to make reviews and audits of a grantee's activities, and permits him to

make to "make appropriate adjustments in the amount of the annual grants" in accordance with his findings. 42 U.S.C. § 5304(d). Section 5311 addresses past noncompliance, and requires the Secretary to impose conditions if, after notice and opportunity for hearing, he finds that the grantee "has failed to comply substantially with any provision of this chapter ...". 42 U.S.C. § 5311(a). Use of this latter provision is mandated for cases of past noncompliance which do not affect current or future performance, but it is sparingly invoked because of the procedural safeguards for the grantee attendant to its exercise. *See, e.g., Kansas v. HUD*, 861 F.2d 739, 742–44 (D.C.Cir.1988).

The process HUD points to is not required under section 5304, which deals with current noncompliance. Since the plaintiff claims that the failure to pass enabling legislation endowing the Boston Fair Housing Commission with jurisdiction and enforcement powers constitutes current nonperformance of its fair housing obligations, section 5304 may be invoked rather than section 5311.

The City's 1981 CDBG application was premised on the implementation of a fair housing plan, which included provision for meaningful enforcement of minority access to housing opportunities. While a fair housing ordinance has been passed, and a fair housing commission created, enabling legislation has never been passed which gives the commission enforcement power. These measures appear to be ineffective to fulfill the City's undertaking, and it is unclear why HUD deemed them sufficient to demonstrate compliance. Accordingly, there also seems to be valid grounds for invoking the agency's conditioning power under section 5311, since it does not appear that the City ever was in genuine compliance with these conditions.

HUD admits, moreover, that the conditions and assurances it imposed beginning in 1977, were imposed without any findings that the City discriminated in its HUD funded programs. Given this representation, and the fact that the conditions included the passage of legislation, I find the defendant's procedural and federalism arguments against "hold[ing] the City and State's block grant 'hostage' until they enact desired legislation" unconvincing.

In addition, HUD contends that such a condition would be impermissible since it is obliged to award UDAG funds on the basis of a national competition utilizing uniform selection criteria, under 42 U.S.C. § 5318(d)(1), and that it is expressly barred from discriminating in such allocation of funds based on the type of activity involved, under 42 U.S.C. § 5318(r). In my opinion that provision has absolutely nothing to do with HUD's obligation to promote the fair housing goals expressly declared in the Act.

An order shall enter substantially in accordance with the plaintiff's request.

**(d) Promulgation of Regulations**

The plaintiff seeks an order that HUD promulgate regulations and guidelines which set forth standards for HUD's administration and recipients' use of funds under HUD's housing and community development programs and activities in accordance with Title VIII. Such an order is designed to facilitate meaningful compliance with and enforcement of fair housing goals. The request tracks my 1983 finding, which the plaintiff seeks to embody in the declaratory portion of the decree, that HUD failed to promulgate standards of performance or regulations under Title VIII.

In addition to challenging the propriety of this demand, HUD represents that such rules and handbooks are already in existence, citing as examples, *Handbook No. 800.3: Fair Housing and Equal Opportunity Monitoring of Community Development Programs;* 24 C.F.R. §§ 570.900, *et seq.* In addition, HUD points to recent statutory and regulatory amendments which impose more stringent standards on recipients of Fair Housing Assistance Program Funds. The plaintiff concedes that new regulations have been proposed, but argues that they are inadequate in that they relate solely to the processing of private individual claims of discrimination,

and give no guidance to HUD or grantee administrators.

The court of appeals expressly noted that my remedial power under the APA, 5 U.S.C. § 706(1), includes the power to compel the Secretary to promulgate regulations to carry out the intent of Congress, where he has failed to exercise his discretion to do so. *NAACP v. HUD, supra,* 817 F.2d at 160. Nevertheless, I am very reluctant to add to the existing mountain of federal rules and regulations. I am only concerned with the specific local problems raised in this case. In my opinion the proper articulation of the conditions described above in each grant of HUD funds will be sufficient to the occasion.

## ORDER

A declaratory judgment and final decree shall enter forthwith in accordance with the foregoing.

## DECLARATORY JUDGMENT AND FINAL DECREE

After a trial in this action for declaratory and injunctive relief, and after consideration of the parties' submissions with respect to remedies and in accordance with the memorandum filed herewith:

I. *Declaratory Relief*

It is Declared that:

A. During the period 1977 to 1982, in administering its programs and activities relating to housing and urban development in the City of Boston ("the City"), HUD did not satisfy minimum levels of compliance with Title VIII of the Civil Rights Act of 1968, 42 U.S.C. § 3608(e)(5), as amended, to administer its programs and activities in a manner affirmatively to further the policies of fair housing by:

1. Failing to promulgate regulations or guidelines which adequately set forth standards for HUD's administration and recipients' use of funds under HUD programs;

2. Failing to secure a minority needs assessment from the City in a timely manner;

3. Failing adequately to condition and monitor use of its funding by grantees and recipients, so as to assure the use of these monies to produce an adequate supply of affordable integrated family housing; and

4. Failing to require effective fair housing enforcement by the City.

B. In light of HUD's failure to comply with its statutory mandate, and the resultant lack of affordable desegregated housing, Metropolitan Area relief is appropriate under these circumstances, and to the extent provided in this Decree.

II. *Remedial Order*

It is Ordered that:

A. Metropolitan Area Relief

HUD shall require the owners and managers of any assisted public or private housing within any city or town within the Boston Metropolitan Statistical Area, including Boston ("the Metropolitan Area"), to participate fully in available programs designed to facilitate access to suburban housing opportunities for low-income minority households now living in the City. These programs shall include, without limitation, the listing requirements and affirmative marketing programs created pursuant to Section II.C.3 of this Decree.

The requirements of this Decree shall apply with equal force to all assisted housing in the Metropolitan Area. "Assisted Housing" means housing the cost of whose purchase, development, operation or rehabilitation is subsidized in whole or in part with public funds or other resources, whether such funds or resources derive from federal, state or local government.

In enforcing this Decree, HUD shall use any power it possesses to impose conditions on grantees, recipients, or beneficiaries, pursuant to any grant or any other program.

B. Fair Housing Conditions Upon Funding to the Commonwealth of Massachusetts.

Following entry of this Decree, HUD shall include in any approval of an applica-

tion for funding by the Commonwealth, under any grant or other program administered by HUD pursuant to which it has the power to impose conditions upon grantees or recipients, the following conditions:

1. That the Commonwealth require owners and operators of any state-assisted public or private housing available for rental or sale in the Metropolitan Area to participate fully in programs designed to enhance access to low-income housing by Black households, including but not limited to, Section 8 rental subsidies and the listing and affirmative marketing programs created pursuant to Sections II.C.3 of this Decree.

2. That the Commonwealth promulgate legislation granting the Boston Fair Housing Commission ("the Commission") effective enforcement powers, including but not limited to, the power to issue subpoenas, levy fines and institute civil actions;

3. That the Commonwealth prepare and provide such reports and statements regarding assisted housing in the Metropolitan Area as are required from time to time by HUD. Such submissions shall include, without limitation, reports on the racial and family composition of state-assisted housing, and a statement of the projected use of funds and community development plan, as required by 42 U.S.C. § 5304.

C. Fair Housing Conditions Upon Funding to the City

Following entry of this Decree, HUD shall include in any approval of an application for funding by the City, under any grant or other program administered by HUD pursuant to which it has the power to impose conditions upon grantees or recipients, the following conditions:

1. That the City require the owners and operators of any City-assisted public or private housing available for rental or sale to participate fully in programs designed to enhance access to low-income housing by low-income Black households, including but not limited to Section 8 rental subsidies and the listing and affirmative marketing programs created pursuant to Section II.C.3 of this Decree.

2. That the City promulgate an amendment to its Fair Housing Ordinance eliminating the exemption of housing consisting of five or fewer units;

3. That within 60 days after HUD's approval of the application, the City design and submit to HUD and the plaintiff and, upon HUD's approval, implement a Fair Housing Program, to be administered by the Commission, including, without limitation, the following components:

a. *A Boston Housing Opportunity Clearing Center,* in which shall be listed all assisted public or private housing units available for sale or rental in the Metropolitan Area, which are required to be listed by this Decree or any other authority, or any private units which are offered for listing by their owners or operators;

b. *A Fair Housing Law Enforcement Program,* designed to identify and alleviate racially discriminatory practices in the sale and rental of housing in the City, which shall, without limitation:

(i) Hear and investigate complaints of discriminatory practices;

(ii) Bring administrative and judicial proceedings against persons engaging in discriminatory practices;

(iii) Assist victims of discrimination by providing information as to rights and available remedies, and referrals to legal services organizations and private attorneys available to assist in discrimination claims.

c. *An Affirmative Marketing Program* pursuant to 24 C.F.R. 200.620, which requires the owners and operators of assisted housing in the City to pursue affirmative fair housing marketing policies in soliciting buyers and tenants, in determining their eligibility, and in concluding sales and rental transactions.

The Plan shall be designed to enhance the availability to persons of color of housing in neighborhoods which are now predominantly white. The goal of the Plan and its measure of success shall be to achieve a racial composition in assisted housing, in neighborhoods which are pre-

dominantly white, which reflects the racial composition of the City as a whole.

d. *A Fair Housing Public Education Program* designed to make use of various public forums, such as broadcast media, bill boards, and community and social service organizations, to inform the public of rights and available remedies under applicable fair housing and anti-discrimination laws and regulations, including but not limited to, the existence and functions of the Commission, the Clearing Center, and of the other components of the Fair Housing Program;

4. That the City prepare and submit to HUD such reports and statements regarding assisted housing as are required from time to time by HUD. Such submissions shall include, without limitation, a report on the racial and family composition of assisted housing, and a plan for the projected use of funds for community development, as required by 42 U.S.C. § 5304.

### D. Stock of Affordable Housing

1. HUD shall use its best efforts and available resources to increase the supply of affordable integrated family housing in the City, whether public, public-assisted, or private.

2. HUD shall not agree to any disposition of HUD-assisted housing which has the effect of reducing the supply of affordable family housing in the City available as of the effective date of this Decree.

### III. *Monitoring and Reports*

Commencing three months after the effective date of this Decree and every six months thereafter, HUD shall submit to the court and serve upon the plaintiff:

A. A report prepared by HUD or its grantees setting forth the current racial makeup, family composition and vacancy rate of HUD assisted housing projects or units in the City;

B. A report describing the activities carried out and the results achieved in implementing this Decree.

### IV. *Retention of Jurisdiction*

A. Jurisdiction is retained by the court for the purpose of enabling the plaintiff and HUD to apply to the court at any time for such further orders as may be necessary or appropriate for the construction, implementation, modification or enforcement of this Decree.

B. At any time after the fifth anniversary of the effective date, either HUD or the plaintiff may request the court to review the progress made in implementing this Decree, and, based upon such review, to modify or terminate any and all rights or obligations provided therein.

C. If HUD is unable to comply with its obligations under this Decree, for lack of authorization or any other reason, the plaintiff may move for such comparable alternative relief as is appropriate.

### CLARIFICATION AND AMENDMENT OF JUDGMENT

On June 23, 1989, I issued a Declaratory Judgment and Final Decree ("the Decree"), setting forth the relief to be accorded the plaintiff N.A.A.C.P. The federal defendants move to amend the judgment, pursuant to Fed.R.Civ.P. 59(e), in order to clarify HUD's obligations under the Decree and to modify certain aspects of the Decree which might defeat its objectives. In general, the decree intentionally broadens the obligations of the defendants. It is a remedial decree as opposed to an order enforcing existing obligations.

1. Inclusion of Section 8 Housing in Metropolitan Area Relief

The omission of a specific reference to the Section 8 rental subsidy program in section II.A of the Decree, dealing with Metropolitan Area Relief, does not indicate an intent to exclude the program from this portion of the Decree.

Section II.A, ¶ 1 sentence 2 is amended to read:

"These programs shall include, without limitation, Section 8 rental subsidies and the listing requirements and affirmative

marketing programs created pursuant to Section II.C.3 of this Decree."

### 2. The Meaning of "Assisted Housing"

HUD seeks clarification of the terms "Assisted Housing" and "HUD–Assisted Housing." I hereby modify the decree to expressly include within the definition of these terms (1) housing assisted by government insurance of private mortgage loans, and (2) housing created or developed under CDBG programs.

### 3. "Power to Condition" Absolute or Conditional

HUD questions whether the phrase "*power to condition*" in section II of the Decree leaves it the discretion to refrain from conditioning programs with respect to which it has not made the factual findings normally prerequisite to the exercise of conditioning power.

The direction that HUD "use any power it possesses to impose conditions" applies with respect to any HUD programs within the geographical reach of the Decree whose governing statutes and regulations include conditioning power. I expressly rule that HUD's obligation to impose the conditions set forth in the Decree is not limited to circumstances in which it has made the factual findings normally prerequisite to the exercise of that power, and that it does not have the discretion to refrain from imposing the specified conditions.

### 4. The Meaning of "Available Resources"

The term "Available Resources" refers to funds and other resources available to HUD at a Regional level, not nationwide.

My order that HUD "use its best efforts and available resources" to increase the supply of affordable integrated housing, in section II.D of the Decree, does not direct the agency to make additional funding available or otherwise to channel resources to the Boston Metropolitan Area beyond what the region would otherwise receive, but only to maximize the extent to which available funds are used to provide such housing.

### 5. Meaning of "Affordable Housing"

Section II.D of the Decree obliges HUD to promote the supply of "affordable integrated family housing" in Boston. HUD requests modification of the Decree to define the term "affordable," to facilitate its calculation of the size of the current housing stock. HUD suggests a definition with respect to rental housing, but has no specific definition to proffer in the context of home ownership.

I hereby modify the Decree to include the following, as section II.D.3:

a. "Affordable housing" means housing whose effective cost to a very low, low or moderate income household does not exceed 30% of such household's combined net income.

b. "Very low-income household" means a household whose combined income is not more than 50% of the median income for the City of Boston.

c. "Low-income household" means a household whose combined income is not less than 50% and not more than 80% of the median income for the City of Boston.

d. "Moderate-income household" means a household whose combined income is not less than 80% and not more than 95% of the median income for the City of Boston.

### 6. References to "Persons of Color" and "Blacks"

The reference to "persons of color" is intentional, and will stand.

### 7. Exemptions of Fair Housing Programs

The following HUD programs or actions are exempt from the Decree's conditioning requirements, since as presently constituted these programs support the remedial goals embodied in the Decree.

a. The approval of funds by HUD under the Fair Housing Assistance Program (FHAP);

**374**

b. The execution of contracts between HUD's Fair Housing and Equal Opportunity Office (FHEO) and a city or state agency, to perform fair housing investigations for HUD.