Alfred **RASO**, et al., Plaintiffs, Appellants,

v.

Marisa **LAGO**, et al., Defendants, Appellees.

No. 97–1279.

United States Court of Appeals, First Circuit.

Heard Sept. 5, 1997.

Decided Jan. 27, 1998.

---

12

Chester Darling, Boston, MA, for appellants.

Saul A. Schapiro, Boston, MA, with whom Nina F. Lempert, Hopkinton, MA, Thomas Bhisitkul, Miles, MI, Rosenberg & Schapiro, Boston, MA, Merita Hopkins, Corporation Counsel, Kevin S. McDermott and Amanda P. O'Reilly, Assistant Corporation Counsel, City of Boston Law Department, Boston, MA, were on briefs, for appellees Marisa Lago, Director of the Boston Redevelopment Authority, the Boston Redevelopment Authority, Thomas A. Menino, Mayor of Boston, City of Boston, Victoria L. Williams, Director of the Boston Fair Housing Commission, Boston Fair Housing Commission, Sandra Henriquez, Director of the Boston Housing Authority and Boston Housing Authority.

Rudolph F. Pierce with whom Lynne Alix Morrison, David W. Fanikos, Goulston & Storrs, P.C., Richard M. Bluestein, Paul Holtzman and Krokidas & Bluestein, Boston, MA, were on brief, for Robert H. Kuehn, Jr., President of Keen Development Corp., and as Trustee of the Lowell Square Nominee Trust, Keen Development Corp., Reverend Michael F. Groden, Director of the Planning Office for Urban Affairs, Inc., and as Trustee of the Lowell Square Nominee Trust, Planning Office for Urban Affairs, Inc., Lowell Square Associates Joint Venture, Lowell Square Cooperative Limited Partnership, Mark Maloney, President of Maloney Properties, Inc., and Maloney Properties, Inc.

Susan M. Poswistilo, Assistant United States Attorney, with whom Donald K. Stern, United States Attorney, Boston, MA, was on brief, for Henry G. Cisneros, Secretary of the Department of Housing and Urban Development and Department of Housing and Urban Development.

Before SELYA, BOUDIN and STAHL, Circuit Judges.

BOUDIN, Circuit Judge.

The plaintiffs in this case are former residents of Boston's Old West End who were forced to relocate when their homes were taken by eminent domain for urban renewal. They claim that Massachusetts law entitles them to first preference for tenancy of all

new residential units built on the land, and that they are being denied this preference in a new development called West End Place because most former West Enders are white. The district judge dismissed the complaint, leading to this appeal.

The background facts are undisputed. In May 1956, the Boston Housing Authority, the forerunner to the current Boston Redevelopment Authority ("the BRA"),[1] prepared a plan for urban renewal of Boston's Old West End, a downtown neighborhood lying just north of Beacon Hill. The plan was approved as required under Massachusetts law, and in 1958, the BRA ordered a taking by eminent domain of a large area, displacing over three thousand households of diverse heritages, but including few African Americans.

The BRA executed a lease agreement with a private developer, Charles River Park, Inc. ("Charles River"). Over the next ten years, Charles River razed buildings in the Old West End and built offices, condominiums, and luxury residential units. The new buildings were either nonresidential or so expensive that very few of the former West Enders could afford to occupy them.

In 1970, the BRA terminated Charles River as the project developer and, in 1986, solicited proposals for the development of Lowell Square, located at the intersection of Lomasney Way and Staniford Street, the only remaining large undeveloped section of the Old West End. A proposal was submitted by the Lowell Square Cooperative Limited Partnership (the "developer") to build a new development called West End Place at Lowell Square.[2]

The BRA eventually awarded the developer the redevelopment contract. One restriction in the agreement between the BRA and the developer mirrors a provision of Massachusetts law requiring the BRA to obligate the developer as follows:

(c) to give preference in the selection of tenants for dwelling units built in the pro-

ject area to families displaced therefrom because of clearance and renewal activity who desire to live in such dwelling units and who will be able to pay rents or prices equal to rents or prices charged other families for similar or comparable dwelling units built as a part of the same redevelopment; and

(d) to comply with such other conditions as are deemed necessary to carry out the purposes of this chapter, or requirements of federal legislation or regulations under which loans, grants or contributions have been made or agreed to be made to meet a part of the cost of the project.

Mass. Gen. Laws ch. 121B, § 49 (1986).

The BRA also required that the developer work closely with former West Enders in developing the property. To that end, a number of former West Enders formed the Old West End Housing Corporation. This nonprofit entity and the developer signed a participation agreement, which stated, *inter alia,* that former West Enders would have first preference in the purchase or rental of residential units in West End Place, subject to applicable local, state, and federal laws.

The developer sought out numerous sources of financing, including government funding from local, state, and federal agencies. In particular, the federal Department of Housing and Urban Development ("HUD") funded a grant of $2.5 million for construction, and it also committed $7 million in rent subsidies for the low-income units in West End Place. *See* 42 U.S.C. § 1437f (1994). Like most federal housing assistance, these funds were contingent on compliance with federal fair housing requirements. *See* 24 C.F.R. §§ 1.5, 5.105 (1997).

One such requirement is that developer recipients of federal housing funds must carry out an affirmative program to attract minority, as well as majority, applicants; the pertinent regulation contemplates mailings to

---

1. The BRA is an entity established by the Commonwealth of Massachusetts to undertake urban renewal projects and to relieve housing shortages. *See Collins v. Selectmen of Brookline,* 325 Mass. 562, 564–66, 91 N.E.2d 747, 748–50 (1950).

2. The partnership later underwent a name change and, in addition, the complaint names other private entities and individuals associated with it. For convenience, all are referred to as "the developer."

minority organizations, assurances of nondiscrimination, and like measures. Each applicant is required to set forth its "affirmative fair housing marketing plan" on a HUD form and secure its approval by HUD. *See* 24 C.F.R. § 200.620 (1997).

In addition, HUD is subject to a 1991 consent decree based on a finding that HUD had failed to meet statutory obligations to ensure that the minority population of Boston had equal access to public housing. *NAACP, Boston Chapter v. Kemp*, No. 78–850–S (D.Mass. Mar. 8, 1991) (consent decree). The consent decree provides that all Boston area HUD affirmative fair housing marketing plans "shall have as their goal and measure of success the achievement of a racial composition, in HUD-assisted housing located in neighborhoods which are predominantly white, which reflects the racial composition of the City [of Boston] as a whole." *Id.* at 2.[3]

In preparing its affirmative fair housing marketing plan, the developer attempted to reconcile the explicit statutory obligation of a first preference for former West Enders with HUD's consent-decree goal of a tenancy reflecting the makeup of the City of Boston. Minority races made up 41 percent of Boston's population, but according to HUD's estimate, only about 2 percent of the former West Enders. HUD indicated that it viewed an unqualified preference for former West Enders as contrary to federal fair housing requirements and the consent decree.

The developer, the government agencies, and the Old West End Housing Corporation submitted the matter to mediation. The mediator, a former United States Attorney for Massachusetts, proposed that former West Enders receive a preference as to 55 percent of the units in West End Place, and all other applicants have equal access to the remaining 45 percent. The developer and the agencies agreed; the Old West End Housing Corporation did not. Nevertheless, the mediator's solution was included in the developer's affirmative fair housing marketing plan, which HUD approved in 1996.

The plan operates as follows. West End Place contains 183 residential units that fall into three rent-based categories: 58 "low-income" units (subsidized by HUD funds), 48 "moderate-income units," and 77 units to be rented at market rates. Under the plan, the developer is to give former West Enders first preference as to 101 of 183 units, that is, 55 percent of the total. These 101 units are unevenly distributed over the three rent categories: former West Enders have a preference as to 19 low-income units (33 percent), 24 moderate-income units (50 percent), and 58 market-rate units (75 percent).

The tenant selection works by lottery. Each preliminary application is assigned a random number. The applications are then separated into two pools: pool A contains applications from displaced former West Enders and pool B contains all other applicants. Then, for the low-income units, the top-ranked applicant from pool A is selected, followed by the two top-ranked applicants from pool B; this yields a total of 33 percent pool A applicants (33 percent former West Enders) in the low-income units. The process is then repeated until all 58 units are tentatively allocated.

The same lottery approach is used for the other two categories of apartments. For moderate-income units, the draw ratio is one-to-one (50 percent former West Enders); for the market-rate units, three-to-one (75 percent former West Enders). Applicants who have been selected in this process are then invited to complete a full application and undergo a more thorough screening process, which can include verifications of personal references and credit history. The same process can supply additional applicants if needed.

From August 26 to September 26, 1996, a real estate manager hired by the developer

---

**3.** The consent decree ended lengthy litigation, which included an appeal to this court, over HUD's duties to foster integrated housing. *See NAACP, Boston Chapter v. Pierce*, 624 F.Supp. 1083 (D.Mass.1985), *vacated and remanded, NAACP v. Secretary of Hous. & Urban Dev.*, 817 F.2d 149 (1st Cir.1987), *on remand, NAACP, Boston Chapter v. Kemp*, 721 F.Supp. 361 (D.Mass. 1989). The decree provided that its provisions did not "constitute" and should not be "construed as" a quota.

coordinated community outreach efforts to stimulate preliminary applications. The manager also contacted former West Enders as well as the Old West End Housing Corporation. The manager eventually received 1,858 timely preliminary applications, 308 of which identified the applicants as former West Enders. Of the 308 former West Ender applicants, 12 identified themselves as black, one as Latino, and 19 did not identify their race.

On September 26, 1996, the individual plaintiffs—four former West Enders—filed a complaint in the district court challenging the tenant selection process and the plan on numerous grounds; they purported to represent former West Enders as a class. The Old West End Housing Corporation was also named as a plaintiff. The numerous defendants divide into four categories: the BRA and its director; HUD and its Secretary; the City of Boston and various of its officials; and, finally, the developer and other private parties associated with the development of West End Place.

On October 21, 1996, the plaintiffs filed an emergency motion for a preliminary injunction to halt the lottery, which was later withdrawn when the defendants agreed to let the former West Enders' representatives monitor the lottery. In the lottery, which took place on October 29, 1996, two of the named plaintiffs received rankings in the lottery that make it unlikely that they will receive units in West End Place.

The developer and various other defendants moved to dismiss the complaint, Fed. R.Civ.P. 12(b)(6), and the district court heard argument on the motion on November 20, 1996. On January 6, 1997, the district court issued an opinion dismissing many of the claims with prejudice. *Raso v. Lago*, 958 F.Supp. 686 (D.Mass.1997). After the former West Enders declined to amend their complaint to allege discriminatory implementation of the plan—an opportunity offered by the district court—the district court dis-

missed all claims with prejudice and entered judgment for the defendants on February 11, 1997.

The former West Enders appeal from the dismissal of only two of the numerous claims they made in the district court: first, a claim under 42 U.S.C. § 1983 that the plan violates equal protection principles because it comprises a forbidden racial classification, and second, a claim that section 49 creates a trust that subjects the BRA and developer to a trustee's fiduciary duties in favor of the former West Enders. There are also a few references to the Tenth Amendment and to federal statutes but these references are not seriously developed in plaintiffs' briefs.

■■■■ We begin with section 1983, which pertinently provides that no person may deprive any person of his or her constitutional rights under color of state law. 42 U.S.C. § 1983. The City of Boston and the BRA are both "state actors," *see Monell v. Department of Soc. Servs.*, 436 U.S. 658, 690, 98 S.Ct. 2018, 2035, 56 L.Ed.2d 611 (1978), and the BRA played a central role in developing and fostering the plan challenged by plaintiffs. HUD is a federal entity not subject to section 1983, but its officials are directly constrained by equal protection principles.[4]

In their complaint, the former West Enders allege that race was a motive for curtailing the statutory preference otherwise available to them. Specifically, the complaint cites the defendants' reliance upon the consent decree as comprising a racial purpose and goal and asserts that, as a result, the former West Enders were deprived of a benefit—a statutory preference for all of the apartments—based upon "a racial classification." In their appeal brief, plaintiffs' shorthand version is that the preference was curtailed "because" the former West Enders were predominantly white.

Factual assertions in a complaint are normally accepted as true for purposes of a

4. The Fifth Amendment's Due Process Clause embodies the core of the equal protection doctrine, *see Bolling v. Sharpe*, 347 U.S. 497, 499–500, 74 S.Ct. 693, 694–95, 98 L.Ed. 884 (1954), and the Secretary of HUD, a named defendant in this case, is subject to suit for injunctive relief for violations of the Constitution. *See, e.g., Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682, 689–91, 69 S.Ct. 1457, 1461–63, 93 L.Ed. 1628 (1949); E. Chemerinsky, *Federal Jurisdiction* § 9.1.1, at 451–52 (1989).

motion to dismiss, *see, e.g., Berner v. Delahanty,* 129 F.3d 20, 25 (1st Cir.1997); in addition, the defendants do not dispute that racial concerns and the consent decree prompted their effort to cut back upon the statutory preference. The reason is apparent: the former West Enders are almost entirely white, and without some limitation on the preference rights of former West Enders, HUD would have been funding subsidized apartments from which minorities were effectively excluded.

HUD apparently thought that this outcome would violate the consent decree and its statutory obligation to promote fair housing. *See* 42 U.S.C. §§ 3601–3619 (1994); 24 C.F.R. §§ 200.600–200.640 (1997). HUD may have misunderstood both the consent decree and the federal statute, but whether it did or not, its *purpose* to increase minority opportunities for apartments in West End Place by curtailing the statutory preference is evident. To this end, it appears that HUD simply declined to authorize funding unless and until some of the apartments were made available to applicants other than former West Enders.

■ This undenied racial motive distinguishes the case from those others involving facially neutral actions—like a zoning law or employee qualification test—where the state actor denies any racial purpose or concern.[5] But the plaintiffs are mistaken in treating "racial motive" as a synonym for a constitutional violation. Every antidiscrimination statute aimed at racial discrimination, and every enforcement measure taken under such a statute, reflect a concern with race. That does not make such enactments or actions unlawful or automatically "suspect" under the Equal Protection Clause.

■ It is quite true that government action taken out of hostility to a racial group can be condemned out of hand, *e.g., Yick Wo v. Hopkins,* 118 U.S. 356, 373–74, 6 S.Ct. 1064, 1072–73, 30 L.Ed. 220 (1886), but there is no allegation whatever in the complaint that the defendants were hostile to whites. Nor would any such motive be remotely plausible. Benign intentions do not immunize government action, but they substantially narrow the inquiry. The primary test is that any government action—regardless of benign intent—is suspect if it has been taken on the basis of a "racial classification"; in such cases, the classification must be justified by a compelling state interest and narrow tailoring. *See Adarand Constructors, Inc. v. Pena,* 515 U.S. 200, 235, 115 S.Ct. 2097, 2116–17, 132 L.Ed.2d 158 (1995).

Despite the use of the "racial classification" label, the complaint alleges no *facts* that would bring that label into play. *See Shaw v. Digital Equipment Corp.,* 82 F.3d 1194, 1216 (1st Cir.1996). The term normally refers to a governmental standard, preferentially favorable to one race or another, for the distribution of benefits. *E.g., Adarand,* 515 U.S. at 226–27, 115 S.Ct. at 2112–13; *City of Richmond v. J.A. Croson Co.,* 488 U.S. 469, 493, 109 S.Ct. 706, 721, 102 L.Ed.2d 854 (1989) (plurality opinion). Yet under the plan adopted in this case, the apartments freed from the statutory preference are made available to *all* applicants regardless of race.

West End Place was built with federal help and its apartments made especially desirable through federal subsidies. It might not seem remarkable that the government should insist, as a condition of this investment, that a fair number of the apartments should be effectively open to application by tenants of all races. Nor have we been able to find any case where the government has been required to show a compelling interest, or narrow tailoring of remedies, for a condition framed so as to secure *equal* treatment of applicants regardless of race.

Language in a few Supreme Court decisions could be taken to mean that *any* action in which race plays a role is constitutionally suspect. However, the governmental actions in those cases were fundamentally different

---

5. *See, e.g., Village of Arlington Heights v. Metropolitan Hous. Dev. Corp.,* 429 U.S. 252, 270–71, 97 S.Ct. 555, 565–67, 50 L.Ed.2d 450 (1977) (upholding a refusal to rezone property to allow construction of multi-dwelling buildings); *Washington v. Davis,* 426 U.S. 229, 247–48, 96 S.Ct. 2040, 2051–52, 48 L.Ed.2d 597 (1976) (upholding a police department literacy exam that excluded mostly black applicants).

and more provocative. In *Adarand*, the statute gave special incentives to government contractors to hire minority subcontractors.[6] The redistricting cases concern state voting districts designed to concentrate minority voters and effectively to reserve seats for minority candidates.[7]

Taken by itself, HUD's action in this case is almost the opposite of the racial preferences that the Court viewed as questionable in *Adarand* and the redistricting cases. Here, the government's condition on federal funds was that some of the apartments—which otherwise would have almost automatically been occupied by whites—be made available to all applicants on a race-blind basis. We cannot view this as a "racial classification[ ]" reserving benefits for a favored race, *Adarand*, 515 U.S. at 235, 115 S.Ct. at 2116–17, or as "an effort to segregate the races," *Shaw*, 509 U.S. at 642–43, 113 S.Ct. at 2823–25.

Several other equal protection arguments made by the former West Enders need no lengthy discussion, either because they have been essentially abandoned on appeal or because they are clearly unpersuasive. The former category includes the former West Enders' attack on HUD requirements that the apartments be publicized in minority communities;[8] the latter includes the attempt to charge HUD with treating the consent decree's numerical "goal" as if it were a quota—a notion belied by the substantial preference retained for the former West Enders.

The story, however, is not quite over. It is one thing for HUD to insist that the apartments it subsidizes must effectively be open to all races; it would be quite another if HUD planned to impose this requirement only where the beneficiaries of the statutory

preference were white. That, we think, would be government action based on a "racial classification" and would need to be narrowly tailored to serve a compelling government interest.

The difficulty is that we are dealing here with an *ad hoc* administrative action. Accepting the truth of the complaint's factual allegations, HUD's actions were prompted not by any general, racially skewed policy toward statutory preferences but by the peculiar interplay of Boston's consent decree, the Massachusetts statute, and the respective racial makeups of the Boston population and the former West Enders. What HUD would do in some other, hypothetical case is unknown, but it is certainly not precluded, either by the consent decree or anything else, from challenging statutory preferences that exclude whites. *Cf. Otero v. New York City Hous. Auth.*, 484 F.2d 1122, 1125 (2d Cir. 1973).

The plaintiffs have alleged no facts that, if proven, would reveal any secret discriminatory standard, pattern of past practice, or motive beyond the one HUD has admitted, namely HUD's concern that the preference in this instance, if unmodified, would restrict the apartments to whites and subject HUD to sanctions under the consent decree. Plaintiffs simply think that this purpose is enough to condemn HUD's action. For the reasons already given, we do not.

■ We turn now to plaintiffs' second and distinct claim on appeal that Mass. Gen. Laws ch. 121B, § 49, "has the effect of creating a trust for the benefit of people displaced by urban renewal." The district court ruled that there was no demonstrated legislative intent to create a trust and that

---

6. See *Adarand*, 515 U.S. at 205–06, 115 S.Ct. at 2102; *see also Croson*, 488 U.S. at 493–94, 109 S.Ct. at 721–22; *Wygant v. Jackson Bd. of Educ.*, 476 U.S. 267, 279–80, 106 S.Ct. 1842, 1849–50, 90 L.Ed.2d 260 (1986) (plurality opinion); R. Rotunda & J. Nowak, *Constitutional Law* § 18.10(a)(1) (2d ed. 1992 & Supp.1997).

7. See *Bush v. Vera*, 517 U.S. 952, 965–67, 116 S.Ct. 1941, 1955, 135 L.Ed.2d 248 (1996) (plurality opinion); *Miller v. Johnson*, 515 U.S. 900, 906–09, 115 S.Ct. 2475, 2483–85, 132 L.Ed.2d

762 (1995); *Shaw v. Reno*, 509 U.S. 630, 635–36, 113 S.Ct. 2816, 2820–21, 125 L.Ed.2d 511 (1993).

8. HUD's regulations require affirmative outreach in both majority *and* minority communities, *see* 24 C.F.R. § 200.620(a); and in any case outreach efforts are not the real source of the plaintiffs' problem—rather, it is the partial loss of their preference. The defendants are no less guilty of muddling the issue in their pretense that outreach efforts are all that are involved in this case.

the trust argument failed for a further more technical reason. *See* 958 F.Supp. at 700 (citing *New England Trust Co. v. Sanger*, 337 Mass. 342, 348, 149 N.E.2d 598, 601–02 (1958)). On appeal, plaintiffs devote five pages of their brief to discussing the requisites for trust creation under Massachusetts law.

Whether or not Massachusetts law created a trust for the former West Enders appears to us to be beside the point. If we assume *arguendo* that the former West Enders are entitled to, and can enforce, whatever priority is provided under section 49, subject always to superseding federal law, the trust concept is nothing more than a possible alternative remedy for enforcing any unpreempted rights that section 49 may provide. The question to be answered, before remedies are even pertinent, is the extent of those rights.

By its terms section 49(c) creates a priority for displaced former residents, and subsection (d) arguably qualifies this priority by also obligating the developer to comply with "requirements of federal legislation or regulations under which loans, grants, or contributions have been made or agreed to be made to meet a part of the cost of the project." Mass. Gen. Laws ch. 121B, § 49(d). The defendants' position, adopted by the district court, is that such federal requirements—as a matter of Massachusetts law—qualify the statutory priority. Plaintiffs have not challenged this ruling on appeal.

The plaintiffs might have argued that the limitation adopted here is not itself a "requirement" of "federal legislation or regulations" but is merely a developer proposal that HUD has chosen to bless. Possibly, plaintiffs thought that this arguable distinction did not matter because a federal administrative measure, even if not statute or regulation, might override state legislation under the Supremacy Clause—assuming always that it was an authorized measure. This is by no means clear, but arguments on this point have not been made and need not be pursued.

In the district court, it appears that plaintiffs' trust argument may have been advanced primarily as an adjunct to a different constitutional claim, namely a claim that the plan in question impaired a property interest without due process or just compensation. The alleged trust, in this context, would be a way of expressing a claimed property interest. It is not obvious why a trust interest would be more entitled to this status than section 49's simple expression of a priority in favor of former tenants.

In all events, whether called a trust or something else, any property interest created by section 49(c) is arguably subject to section 49's own explicit reservation in section 49(d). As already noted, the plaintiffs on this appeal have not challenged the district court ruling that subsection (d) qualifies subsection (c) and also embraces the disputed plan. Taking these district court rulings as unchallenged, the trust argument adds nothing to the due process argument, which itself has not itself been renewed in the plaintiffs' briefs in this court.

This is a case that stirs conflicting sympathies, for those ousted from their West End neighborhood by "urban renewal" many years ago no less than for minorities wrongly denied fair housing opportunities in Boston. But we have properly sought to decide this appeal based upon Supreme Court precedent, as best we can discern it, recognizing that the case is a difficult and unusual one on the edge of developing law.

*Affirmed.*

STAHL, Circuit Judge, dissenting in part.

There is for me considerable appeal in the majority's resolution of plaintiffs' equal protection claims. The governmental conduct these claims challenge involves a patently good faith and facially reasonable effort to accommodate the competing interests of two historic losers in Boston's housing wars: the racial and ethnic minorities entitled to invoke the protections of the consent decree in *NAACP v. Kemp* and federal fair housing laws, and the former West Enders, an ethnically diverse, lower middle class group which, in the name of "urban renewal," was forced from its neighborhood and could not afford to return.

Nonetheless, I cannot join the portion of the majority opinion that affirms the district court's pleadings-based dismissal of the equal protection claims. While I agree with the majority that reverse discrimination claims like the present one are "on the edge of developing law," *ante* at 18, I do think it settled that, when the government withdraws benefits from a class of citizens because of the race or ethnicity of the class, courts are to scrutinize strictly the government's conduct so as to ensure that it furthers a compelling governmental interest and is narrowly tailored to advance that interest. *See Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 226–227, 115 S.Ct. 2097, 2112–13, 132 L.Ed.2d 158 (1995). For the reasons that follow, I believe plaintiffs' complaint fairly alleges such a withdrawal of benefits. And I do not see how we can, at this stage of the litigation, conclude that such a withdrawal of benefits passes strict scrutiny.

The complaint alleges that the governmental defendants curtailed plaintiffs' statutory preference in order to comply with the consent decree in *NAACP v. Kemp*. *See ante* at 14. Because the purpose of that consent decree is "the achievement of a racial composition, in HUD-assisted housing located in neighborhoods which are predominantly white, which reflects the racial composition of the City of Boston as a whole," *id.* at 14, a reasonable inference to be drawn from plaintiffs' complaint, *see Aybar v. Crispin–Reyes*, 118 F.3d 10, 13 (1st Cir.1997) (reasonable inferences are to be drawn in favor of the party opposing a Fed.R.Civ.P. 12(b)(6) motion), is that defendants acted as they did because the putative plaintiff class was predominantly white. The fact that defendants "do not dispute" this accusation, *ante* at 16, only underscores our obligation to subject defendants' conduct to strict scrutiny, *see Adarand*, 515 U.S. at 224, 115 S.Ct. at 2111 ("[A]ny person, of whatever race, has the right to demand that any governmental actor subject to the Constitution justify any racial classification subjecting that person to unequal treatment under the strictest judicial scrutiny.").

The majority reaches a contrary conclusion—that strict scrutiny does not apply—because it regards the facts plaintiffs have pleaded in support of their equal protection claims insufficient to describe a "racial classification." *See ante* at 16–17 (holding that this case is outside the principle of *Adarand*). In reaching its conclusion, the majority emphasizes the *effect* of curtailing the preference on non-parties to this litigation, *see ante* at 16 ("[T]he apartments freed from the statutory preference are made available to *all* applicants regardless of race."), and the defendants' *intent* in enacting the curtailment, *see id.* at 16 ("It might not seem remarkable that the government should insist ... that a fair number of the apartments should be effectively open to application by tenants of all races."). The majority also reads the complaint to allege only that defendants acted as they did because plaintiffs are racially identifiable; it does not read the complaint to allege that defendants acted as they did because plaintiffs are white. *Id.* at 17.

Taking this last point first, I simply disagree with the majority's reading of the complaint. The complaint does not allege that the preference was curtailed because plaintiffs are racially monolithic; it alleges that the preference was curtailed because of the consent decree. And, as I have stated, because the consent decree operates only in favor of racial and ethnic minorities, it could not be read to require curtailment of the preference if the former West Enders were predominantly black. Thus, for purposes of evaluating defendants' Rule 12(b)(6) motion, I believe we must read into the complaint the allegation the majority believes necessary to trigger strict scrutiny, *see ante* at 17: that defendants would not have acted as they did had the plaintiff class been predominantly of color. *See Aybar*, 118 F.3d at 13; *see also Conley v. Gibson*, 355 U.S. 41, 47–48, 78 S.Ct. 99, 102–03, 2 L.Ed.2d 80 (1957) (Fed.R.Civ.P. 8(a)(2) does not require a complaint to set forth specific facts in support of a general allegation of discrimination).

Even if the majority has properly construed the complaint, I believe plaintiffs' equal protection claims are sufficient to withstand a Rule 12(b)(6) motion and to trigger strict scrutiny. In the redistricting cases,

the Supreme Court has emphasized that government action which subordinates race neutral considerations to an overriding racial purpose is constitutionally suspect: "We recognized in *Shaw* [v. *Reno*, 509 U.S. 630, 113 S.Ct. 2816, 125 L.Ed.2d 511 (1993)] that, outside the districting context, statutes are subject to strict scrutiny under the Equal Protection Clause not just when they contain express racial classifications, but also when, though race neutral on their face, they are motivated by a racial purpose or object." *Miller v. Johnson,* 515 U.S. 900, 913, 115 S.Ct. 2475, 2486–87, 132 L.Ed.2d 762 (1995) (affirming the invalidation, under equal protection principles, of a Georgia congressional redistricting plan designed to increase the number of majority black districts in Georgia) (citation omitted). It remains to be seen whether the Court will press this principle to its outer limit and strictly scrutinize even governmental conduct which, though predominantly motivated by a racial purpose, would not appear to burden any person because of his or her race—*e.g.,* a public university's efforts at recruiting fully qualified applicants of color for its first year law school class. But it seems apparent that defendants' lack of hostility towards whites in particular, *cf. ante* at 16, does not shield their conduct—which has burdened plaintiffs because they are, as a group, racially identifiable—from the most searching judicial inquiry. *See Miller,* 515 U.S. at 913, 115 S.Ct. at 2486–87.

This leads to a final point. I think the majority runs afoul of *Adarand* in concentrating its focus so heavily on both defendants' intent and the effect of defendants' actions on non-parties to this case. The Supreme Court has squarely rejected the argument that classifications motivated by "benign" considerations should not be scrutinized strictly. *See Adarand,* 515 U.S. at 226, 115 S.Ct. at 2112. And though this case does appear unique in that the government conduct at issue is more a withdrawal of a special benefit from whites than a giving of special benefits to members of minority groups,[9] the clear import of *Adarand* is

that it is the plaintiff's "*personal* right to equal protection of the laws," 515 U.S. at 227, 115 S.Ct. at 2112–13, and not some non-party's interest in competing for that which would be the plaintiff's but for his or her race, that is constitutionally safeguarded. Thus, in evaluating the constitutionality of defendants' conduct, we must not look to its effect and motivation with respect to others; we must look at its effect and motivation with respect to plaintiffs. And here, quite clearly, defendants' conduct has had the effect of depriving plaintiffs of a benefit and was prompted by the fact that plaintiffs are mostly white.

Because defendants' conduct should have been strictly scrutinized, their motion to dismiss plaintiffs' equal protection claim should have been denied and they should have been required to produce evidence that their conduct was narrowly tailored to advance a compelling governmental interest. *See Adarand,* 515 U.S. at 227, 115 S.Ct. at 2112–13 (reciting the components of the strict scrutiny inquiry); *see also Aiken v. City of Memphis,* 37 F.3d 1155, 1163 (6th cir.1994) ("When, as here, a race-based affirmative action plan is subjected to strict scrutiny, the party defending the plan bears the burden of producing evidence that the plan is constitutional."). Plaintiffs should then have been put to the burden of proving the unconstitutionality of defendants' conduct. *See Aiken,* 37 F.3d at 1162 ("The party challenging [a racially-preferential] plan retains the ultimate burden of proving its unconstitutionality."). To the extent that the majority has reached a different conclusion, I most respectfully dissent.

9. It is important to note that there is no indication that the benefit originally given (i.e., the full preference) was given to plaintiffs because they were predominantly white; rather, the preference was given because plaintiffs were ousted from their homes.